Julie Cavanaugh-Bill, Nevada Bar # 11533
CAVANAUGH-BILL LAW OFFICES. LLC
401 Railroad St., Ste. 307
Elko, Nevada 89801
(775) 753-4357
julie@cblawoffices.org

Roger Flynn, *Pro Hac Vice Application To Be Filed*
Jeffrey C. Parsons, *Pro Hac Vice Application To Be Filed*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

.

| | | |
|---|---|---|
| | ) | Case No: |
| GREAT BASIN RESOURCE WATCH; | ) | |
| WESTERN SHOSHONE DEFENSE PROJECT, | ) | |
| | ) | |
| Plaintiffs, | ) | COMPLAINT FOR |
| | ) | DECLARATORY AND |
| vs. | ) | INJUNCTIVE RELIEF |
| | ) | |
| UNITED STATES BUREAU OF LAND | ) | |
| LAND MANAGEMENT; UNITED STATES | ) | |
| DEPARTMENT OF THE INTERIOR; AMY | ) | |
| LUEDERS, BLM State Director; and | ) | |
| CHRISTOPHER J. COOK, BLM Mt. Lewis | ) | |
| Field Manager, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>INTRODUCTION</u>

1.      Plaintiffs, Great Basin Resource Watch (GBRW) and Western Shoshone

        Defense Project (WSDP), file this suit for declaratory and injunctive relief

        under the Administrative Procedure Act (APA), 5 U.S.C. § § 701-706, Federal

        Land Policy Management Act of 1976 (FLPMA), 43 U.S.C. § 1701 <u>et seq.</u>,

        the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 <u>et. seq.</u>,

        the Stock Raising Homestead Act of 1916, 39 Stat. 865, 43 U.S.C. §300

        (historical)(SRHA), the President's Executive Order of April 17, 1926

        establishing Public Water Reserve # 107 (PWR 107), other federal laws, and

        their implementing regulations and policies, challenging the decisions of the

        United States Department of the Interior and its Bureau of Land Management

        (BLM) to approve the Mount Hope Project (Project or Mine), a large open pit

        mining project on public lands proposed by Eureka Moly, LLC (EML),

        including the Record of Decision (ROD) approving the Mine and related

        rights-of-way for electrical transmission lines (ROWs), and the corresponding

        Final Environmental Impact Statement (EIS) BLM prepared for the Mine.

2.      The ROD and FEIS are found on BLM's webpage:

        <u>http://www.blm.gov/nv/st/en/fo/battle_mountain_field/blm_information/natio</u>

        <u>nal_environmental/mount_hope_project0.html</u>  (last reviewed February 11,

        2013).

3.      Specifically, Plaintiffs challenge the ROD signed by Christopher J. Cook,

        Field Manager of the Mount Lewis Field Office of the BLM, on November

2

15, 2012, which approved the Project and its Plan of Operation, including the associated ROWs, as well as the determination of the "financial guarantee" and amounts approved in the ROD.  Plaintiffs also challenge the adequacy of the October 2012 FEIS BLM prepared for the Project, as well as the January 4, 2013 decision of BLM State Director Amy Lueders, which rejected the Plaintiffs' petition for State Director review of the ROD and FEIS.

## The Mount Hope Mine Project

4.  The Mt. Hope Mine Project will be one of the largest open pit mines in the nation, with direct operations lasting for more than 70 years, permanent alteration of the landscape, and a complete reworking of the surface and ground water hydrology of three separate watersheds, with adverse impacts to over 200 square miles of public and private land and lasting for hundreds of years.  The Project will have immediate, irreparable, and permanent impacts to the local ranching and farming communities and families which have lived there since the 1860s and to the critical environmental, historical, cultural and wildlife resources that will be either eliminated or significantly affected by BLM's approval of the Project.

5.  "The Project is a proposed molybdenum mine that includes a power transmission line, a water well field, and all associated mine processing facilities and is located in central Nevada approximately 23 miles northwest of Eureka, Nevada. The Project will be located on both public and private lands in Eureka County, Nevada. The 80-year project will have an 18- to 24-month

construction phase, 44 years of mining and ore processing, 30 years of reclamation, and five years of post-closure monitoring. Concurrent reclamation will not commence until after the first 15 years of the Project." ROD at 1.

6.     "The Project Area, which covers 22,886 acres, includes the Mine Facility Area, ROW, and the well field development area. EML's holdings include 14 patented claims and approximately 1,550 lode and millsite mining claims for a total land position of approximately 29,000 acres." ROD at 1-2

7.     "The Mount Hope ore body contains approximately 966 million tons of molybdenite (molybdenum disulfide) ore that will produce approximately 1.1 billion pounds of recoverable molybdenum during the ore processing time frame. Approximately 1.7 billion tons of waste rock will be produced by the end of the 32-year mine life and approximately 1.0 billion tons of tailings will be produced by the end of the 44 years of ore processing. The Project will utilize an open pit mining method and will process the mined ore using a flotation and roasting process. The surface disturbance associated with the proposed activities totals 8,355 acres on both public and private lands." ROD at 2.

8.     "Mining would be conducted 24 hours per day and seven days per week. The mining rate, ore and waste rock combined, would average 232,000 tons per day over the life of the mine. The highest daily mining rates would be

encountered during the first 25 years of production and would average

approximately 265,000 tpd." FEIS at 2-17.

9.     According to the ROD: "proposed project components will include:

• An open pit with a life of approximately 32 years and associated pit
dewatering;

• Waste rock disposal facilities where waste rock will be segregated according
to its potential to generate acid rock drainage;

• Milling facilities including a crusher, conveyors, semi-autogenous grinding
and ball mills, flotation circuits, concentrate dewatering, ferric chloride
concentrate leach circuit, and filtration and drying circuits that will operate for
approximately 44 years;

• A molybdenite concentrate roaster and packaging plant to package the
technical grade molybdenum oxide (TMO) in bags, cans or drums;

• A ferromolybdenum (FeMo) plant for production of FeMo alloy using a
metallothermic process and separate packaging plant for drums and bags;

• Two tailings storage facilities (South tailings storage facility [TSF] and
North TSF) and associated tails delivery and water reclaim systems;

• An ongoing exploration program utilizing drilling equipment, roads, pads,
and sumps;

• Low-Grade Ore Stockpile that will feed the mill after mining ceases;

• Water supply development with associated wells, water delivery pipelines,
access roads, and power in the Kobeh Valley Well Field Area;

• An approximately 24-mile, 230-kV electric power supply line from the
existing Machacek substation, with a substation and distribution system
located in the ProjectArea;

• A realigned section of the existing Falcon-Gondor powerline, which will
require an amendment to the existing ROW at the time it is needed (near Year
36);

• Ancillary facilities including haul, secondary, and exploration roads, a ready
line (location of haulage equipment that is ready for use on a daily basis),
warehouse and maintenance facilities, storm water diversions, sediment
control basins, pipeline corridors, reagent and diesel storage, storage and
laydown yards, ammonium nitrate silos, explosives magazines, fresh/fire
suppression water storage and a process water storage pond, monitoring wells,
an administration building, a security/first aid building, a helipad, a
laboratory, growth media/cover stockpiles, borrow areas, mine power loop,

communications equipment, hazardous waste management facilities, a Class III waivered landfill, and an area to store and treat petroleum contaminated soils;

• Turn lane(s) on SR 278;

• The option for the toll roasting of Mo from concentrate offsite; and

• The closure of the tailings storage facility and the potentially acid generating (PAG) waste rock disposal facility with the use of evapotranspiration cells to manage the long term discharge from these facilities, as well as the physical reclamation of all Project components."

ROD at 5-6.

10.     The excavated mine pit will be one of the deepest mine pits in the country.

"The ultimate pit depth would be approximately 2,600 feet below ground surface." FEIS at 2-4.  *See also* FEIS Figure 2.1.6 (cross-section diagram).

11.     "The Project would generate approximately 1.7 billion tons of waste rock that would occupy a total footprint of approximately 2,246 acres. Waste rock would be placed in two distinct WRDFs [Waste Rock Disposal Facility] over the life of the mine, which would almost encircle the open pit (Figure 2.1.9). The PAG WRDF would ultimately contain approximately 0.5 billion tons of waste and the non-potentially acid generating (Non-PAG) WRDF approximately 1.3 billion tons.  …  The total height of the WRDFs would range from 750 feet to 950 feet (Table 2.1-3)."  FEIS at 2-23.

12.     In addition, the Project will involve the pumping of the regional aquifer during mining in order to keep the mine pit dry.  According to the FEIS:

"Dewatering would be required in the open pit during the mining phase of the Project. The open pit dewatering would be achieved with in-pit sumps and, if necessary, horizontal drains and perimeter wells would also be used. The average pit inflow rate is estimated to range between 60 to 460 gpm (100 to 750 afy), commencing in Year 1 of the Project and continuing through

Year 32, as shown in Table 3.2-7. In addition, ground water pumping in the KVCWF area for process-water supply would be achieved with high capacity production wells completed in the basin-fill and carbonate bedrock aquifers. The average total combined pumping rate of the well field is estimated to range between 6,540 to 7,000 gpm (10,550 to 11,300 afy), commencing in Year 1 of the Project (2012) and continuing through Year 44 (2055), as shown in Table 3.2-7.

FEIS at 3-74.  One acre-foot of water equals approximately 325, 851 gallons.

13.      Thus, the "combined pumping rate of the well field," at 10,550 to 11,300 afy

(acre-feet per year), coupled with the 750 afy of pit pumping, equals over 3.92

billion gallons of water pumped per year.  With the predicted pumping to last

roughly 43 years, this means that, in total, up to 168.8 billion gallons of water

will be removed from the Mt. Hope area by the Project's dewatering.

14.      "The open pit dewatering activities and KVCWF pumping would lower (draw

down) the water table in the vicinity of those facilities. The predicted

maximum drawdown in the bedrock of the open pit area is approximately

2,250 feet, whereas in central Kobeh Valley, the predicted maximum

drawdown is approximately 120 feet near the center of the well field after 44

years of pumping."  FEIS at 3-74 to -75.  *See also* FEIS Figure 3.2.18, FEIS at

3-81 (showing predicted drawdown levels).

15.      As a result of this dewatering, the FEIS predicts that "22 springs two perennial

stream segments (Roberts Creek and Henderson Creek) and portions of four

intermittent and ephemeral stream drainages" are within the area where at

least a ten-foot drop in the water level will occur (the 10-foot drawdown

cone).  FEIS at 3-80.

7

16.     "The ground water drawdown under the Proposed Action is predicted to be

more than ten feet for two perennial stream segments (Roberts Creek and

Henderson Creek) and at 22 perennial or potentially perennial spring sites

(Table 3.2-8) for varying periods up to at least 400 years after the end of the

mining and milling operations."  FEIS at ES-19 (Table ES-1).

17.     The FEIS also predicts that "Impacts to surface water resources could occur in

areas with less than ten feet of predicted drawdown."  FEIS at 3-79.  *See* FEIS

Table 3.2.8 "Springs that May be Affected by Project Activities," FEIS at 3-

79.

18.     The FEIS "assumed that all of the springs located in the area projected to

experience ten feet or more of drawdown are interconnected with the regional

groundwater system and potentially could be impacted due to water-table

lowering attributable to the Proposed Action."  FEIS Appendix H at 446.

19.     The Project will result in significant and irreparable adverse impacts to the

springs, seeps, waterholes and streams affected by the Project's dewatering,

especially those ground and surface waters within the 10-foot drawdown cone.

Mine dewatering**,** ground water pumping**,** and subsequent recovery of the
water table is expected to draw down the ground water table in an area
surrounding the open pit. As discussed in Section 3.2, modeling results show
that significant water table drawdown in the aquifer would occur in an area
measuring approximately 232 square miles around the Project Area, including
the northeast quadrant of Kobeh Valley and the southernmost fringe of
Roberts Mountains. Stock water resources within the ten-foot drawdown
contour from Proposed Action pumping include water rights within the
Romano, Lucky C, Roberts Mountain, 3 Bars, and Santa Fe/Ferguson
Allotments. Eighteen existing stock water rights occurring within the ten-foot
drawdown area may experience negative impacts including a reduction in
available water or complete water loss as a result of ground water drawdown

associated with the Proposed Action (Figure 3.12.1). Table 3.2-7 in the Water Resources - Water Quantity Section identifies the water rights associated with stock water that would be located within the ten-foot drawdown contour from the Proposed Action activities. Twenty-two springs and two segments of perennial streams are also located within the area predicted to be impacted by the ground water drawdown.  Livestock that utilize those sources of water could be affected. Springs predicted to be impacted are shown on Figure 3.2.9.

FEIS at 3-424 to -425.

20.     Water flows in springs and waterholes on public land in the West are reserved for public use by Public Water Reserve # 107 ("PWR 107"), which was created by Executive Order by President Calvin Coolidge in 1926.  PWR 107 provides:

> [I]t is hereby ordered that every smallest legal subdivision of public land surveys which is vacant, unappropriated, unreserved public land and contains a spring or water hole, and all land within one quarter of a mile of every spring or water hole located on unsurveyed public land, be, and the same is hereby, withdrawn from settlement, location, sale, or entry, and reserved for public use in accordance with the provisions of Section 10 of the Act of December 29, 1916.

Executive Order of Apr. 17, 1926, previously codified at 43 C.F.R. § 292.1 (1938).  *See also* GENERAL LAND OFFICE, DEPARTMENT OF INTERIOR, CIRCULAR 1066, 51 I.D. 457-58 (1926) ("[t]he above order [PWR #107] was designed to preserve for general public use and benefit unreserved public lands containing water holes or other bodies of water needed or used by the public for watering purposes."). 1926 I.D. LEXIS 45.

21.     The 1926 Executive Order and withdrawal were promulgated under the authority of Section 10 of the Stock-Raising Homestead Act of Dec. 29, 1916, 39 Stat. 862, 865, 43 U.S.C. § 300 ("SRHA"), which provided that withdrawn

"lands containing water holes or other bodies of water needed or used by the

public for watering purposes … shall, while so reserved, be kept and held

open to the public use for such purposes…."

22.     The SRHA referenced the withdrawal authority of the Executive contained in

the Pickett Act of June 25, 1910, c. 421, § 1, 36 Stat. 847, as amended by the

Act of August 24, 1912, c. 369, 37 Stat. 497, 43 U.S.C. §§ 141, 142.  As

originally enacted in 1910, the Pickett Act provided that withdrawals under its

authority were to remain open under the mining laws for the mining of

"minerals other than coal, oil, gas, and phosphates."  The 1912 amendment

changed the limitation to state that withdrawn lands would remain open for

the mining of "metalliferous minerals." "[A]ll lands withdrawn under the

provisions of this Act shall at all times be open to exploration, discovery,

occupation, and purchase under the mining laws of the United States, so far as

the same apply to metalliferous minerals." Chap. 369, 37 Stat. 497 (1912).

23.     This provision of the Pickett Act, keeping withdrawn lands open for the

mining of metalliferous minerals, however, was repealed by Section 704(a) of

FLPMA in 1976.  Pub. L. 94-579, 90 Stat. 2786.  Thus, after the enactment of

FLPMA, the exclusion for metalliferous minerals was revoked, and lands

surrounding PWR 107 springs were closed to the mining laws for all minerals.

24.     FLPMA did not, however, remove or eliminate withdrawals of lands or waters

made prior to the passage of FLPMA, but rather specifically affirmed them.

"All withdrawals, reservations, classifications, and designations in effect as of

the date of approval of this Act [Oct. 21, 1976] shall remain in full force and

effect until modified under the provisions of this Act or other applicable law."

43 U.S.C. § 1701, note (c) to Section 701 of Pub. L. 94-579, 90 Stat. 2786.

25.     PWR 107, and its withdrawal of lands and reservation of waters, was never

eliminated or removed by any Act of Congress or by the President or

Executive Branch.  Thus, it "remain[s] in full force and effect."

26.     Regarding the lands withdrawn by PWR 107, if the lands were surveyed at the

time of the Order, PWR 107 reserved the "smallest legal subdivision," or 40

acres, around the spring.  If the lands were unsurveyed, PWR 107 withdrew

all lands "within one quarter of a mile of every spring or waterhole" or a circle

encompassing roughly 300 acres.  In this case, it is not known whether all the

lands containing the PWR springs noted in this Complaint were surveyed by

April 27, 1926, the date the Executive Order withdrew these lands.  For the

purposes of this Complaint, the ¼ mile figure is used to delineate the

withdrawn lands.  However, if the lands at and surrounding the PWR springs

were surveyed by that time, then 40 acres around each PWR spring were

withdrawn and that figure delineates the lands withdrawn and protected by

PWR 107.  In any event, as shown herein, BLM approved the location of

Project facilities (including the Waste Rock Dumps) within the 40 acres, or

within ¼ mile, of the PWR 107 springs.

27.     Included within the FEIS's list of affected springs within the drawdown area

are springs that contain these federal reserved water rights and withdrawn

lands.  As stated in the FEIS:

> In 1926, a carte blanche Public Water Reserve (PWR) was created through an
> EO by President Coolidge entitled "Public Water Reserves No. 107" (PWR
> 107). PWR 107 ended the site-specific system of reserving springs and water
> holes. The purpose of PWR 107 was to reserve natural springs and water holes
> yielding amounts in excess of homesteading requirements. This order states
> that "legal subdivision(s) of public land surveys which is vacant,
> unappropriated, unreserved public land and contains a spring or water hole,
> and all land within one quarter of a mile of every spring or water be reserved
> for public use."

FEIS at 3-58.

28.     "Public Water Reserves (PWR 107) are acknowledged in the State of Nevada

by issuance of a Reserved water right permit by the State Engineer. The BLM

has filed applications for Reserved water rights for stockwater and wildlife

use in Kobeh Valley and the adjacent basins, with subsequent Reserved

permits being granted by the State Engineer. These are acknowledged and

disclosed in the EIS within the modeled area of Project drawdown, including

the rates and annual duties granted."  FEIS Appdx. H at 431.  *See also* FEIS

Table 3.2-6 ("Non-EML Water Rights That May be Affected by Project

Activities."), FEIS at 3-61 to -62.

29.     There are at least four adjudicated PWR 107 Federal Reserved Water Rights

within the 10-foot drawdown cone.  These are listed as either a spring number

and/or a Nevada State Engineer Permit/ID number. Table 3.2-6.  According to

the FEIS and Nevada State Engineer, the following springs within the

drawdown cone are adjudicated PWR 107 Reserved Rights: 619 (Nevada ID R06940), 597 (R06942), 612 (R06944), 742 (R06951).  FEIS Table 3.2-6. *See also* FEIS Figure 3.2.18 (showing drawdown cone and location of Springs 597, 612, 619, 742 (among others)).

30.     The FEIS "assumed that all of the springs located in the area projected to experience ten feet or more of drawdown are interconnected with the regional ground water system and potentially could be impacted due to water-table lowering attributable to the Proposed Action."  FEIS at 3-87.

31.     Spring 619 is known as the "Mt. Hope Spring," and was submitted by BLM as a PWR 107 Reserved Right to the State Engineer in 1994 (R06940), covering water for 400 cattle and 75 horses.  The adjudicated reserved right is for .0147 cubic feet per second which equates to 6.6 gallons per minute, year round. *See* Nevada Division of Water Resources website:

http://water.nv.gov/data/permit/permit.cfm?page=1&app=R06940 (last reviewed February 15, 2013).  Spring 619 is also shown as Spring # SP-4.  Compare FEIS Figure 2.1.5 (map of Project facilities) with Figures 3.2.18 and 3.2.20 (maps of spring locations).

32.     Spring 619/SP-4 is located immediately adjacent to, or within, the proposed north Waste Rock Disposal Facility (WRDF), which will receive the Potentially Acid Generating Waste Rock (PAG-WRDF), and is less than 1,000 feet from the Non-PAG WRDF.  FEIS Figure 2.1.5.

33.     "The Project would generate approximately 1.7 billion tons of waste rock that

would occupy a total footprint of approximately 2,246 acres. Waste rock

would be placed in two distinct WRDFs over the life of the mine, which

would almost encircle the open pit (Figure 2.1.9). The PAG WRDF would

ultimately contain approximately 0.5 billion tons of waste and the non-

potentially acid generating (Non-PAG) WRDF approximately 1.3 billion

tons."  FEIS at 2-23.

34.     Spring 597 is known as the "Garden Spring," and was submitted by BLM as a

PWR 107 Reserved Right to the State Engineer in 1994 (R06942), covering

water for 400 cattle and 75 horses.  The adjudicated reserved right is for .0147

cubic feet per second which equates to 6.6 gallons per minute, year round. *See*

Nevada Division of Water Resources website:

http://water.nv.gov/data/permit/permit.cfm?page=1&app=R06942 (last

reviewed February 15, 2013).  Spring 597 is also shown as Spring # SP-2 (or

SP-2A).  Compare FEIS Figure 2.1.5 (map of Project facilities) with Figures

3.2.18 and 3.2.20 (maps of spring locations).

35.     Spring 597/SP-2/2A is located within or immediately adjacent to the proposed

"Growth Media Stockpile" near the northern boundary of the Project Area,

where soil, dirt, and other growth media will be dumped prior to its use in

post-mining reclamation.  FEIS Figure 2.1.5.

36.     Spring 612 is also within the 10 foot drawdown cone.  Spring 612 is known as

"McBrides Spring," and was submitted by BLM as a PWR 107 Reserved

Right to the State Engineer in 1994 (R06942), covering water for 400 cattle and 75 horses. The adjudicated reserved right is for .0147 cubic feet per second which equates to 6.6 gallons per minute, year round. *See* Nevada Division of Water Resources website:

http://water.nv.gov/data/permit/permit.cfm?page=1&app=R06944 (last reviewed February 15, 2013).

37.      Spring 742 is known as the "Lone Mtn. Spring," and was submitted by BLM as a PWR 107 Reserved Right to the State Engineer in 1994 (R06951), covering water for 100 cattle and 75 horses. The adjudicated reserved right is for .0054 cubic feet per second which equates to over 2.4 gallons per minute, year round. *See* Nevada Division of Water Resources website:

http://water.nv.gov/data/permit/permit.cfm?page=1&app=R06951 (last reviewed February 15, 2013).

38.      Additional PWR reserved rights/lands are within the drawdown cone, but apparently have yet to be recognized by BLM as such or adjudicated by the State Engineer. FEIS Figure 3.2.14 ("Non-EML-Controlled Water Rights and PWRs"), FEIS at 3-63; Figure 3.2.18. These springs are noted as #s 604 and 646. FEIS Figures 3.2.18 and .20. *See also* Figure 3.2.14 (showing PWR Reserved Rights in the approximate location of these Springs). Although not formally adjudicated, these springs and waters are reserved under PWR 107 and are entitled to all the protections afforded adjudicated PWR rights. "The [PWR 107] Order has withdrawn all lands containing springs and water holes

… regardless of whether the water source has been the subject of an official finding as to its existence and location."  Opinion by the Office of Solicitor, U.S. Department of the Interior, <u>Federal Water Rights of the National Park Service, Fish and Wildlife Service, Bureau of Reclamation, and the Bureau of Land Management</u>, M-36914, 86 Interior Decision 533, 1979 WL 34241, *587 (June 25, 1979).

39.     Spring 646, also known as SP-7 (FEIS Table 3.2-9, FEIS at 3-103), is located in the middle of the southern portion of the Non-PAG WRDF.  Figure 2.1.5. Spring 604, which appears to be known as SP-3, is located immediately adjacent to, or within, the proposed PAG WRDF.  FEIS Figure 2.1.5.

40.     The ROD approves the construction or location of mine facilities (shown on Figure 2.1.5) within one quarter mile of Springs 597, 604, 619, and 646, or at a minimum within the 40 acres surrounding each spring withdrawn by PWR 107, whichever is applicable.  Indeed, the construction or location of mine facilities are approved to be located/constructed either right on top of, and/or immediately adjacent to, these springs.  In addition to the loss/reduction of flows at these springs, "springs (619, 639, 646) would also be directly affected by construction of Project components."  FEIS at 3-79.

41.     All of the PWR 107 waters noted herein existed on April 17, 1926.  Thus, the priority date of the PWR 107 federal reserved water rights is the date of that Executive Order, April 17, 1926.  For example, BLM's application for the adjudication of a PWR 107 reserved right for Spring 619 (Mt. Hope Spring)

(R06940) listed the priority date as April 17, 1926. *See* Nevada Division of

Water Resources website:

http://water.nv.gov/data/permit/permit.cfm?page=1&app=R06940 (last

reviewed February 15, 2013).  *See also* Nevada websites for other adjudicated

PWR springs discussed above (same).

42.     These springs, and the lands surrounding them withdrawn from entry under

PWR 107, will either be eliminated by Project facilities, or so seriously

compromised, that the lands and waters will no longer be available for the

purposes for which the lands and waters were reserved/withdrawn.

43.     BLM did not preclude EML from locating/constructing Project facilities on or

adjacent to, or within a minimum of 40 acres surrounding, the PWR 107

springs, or within ¼ mile of the springs, whichever is applicable based on

whether these lands were surveyed by April 17, 1926.  Nor did BLM consider

an alternative of locating/constructing Project facilities away from the lands

withdrawn around the PWR 107 springs.  BLM did not keep these lands "held

open to the public use" as required by the SRHA and PWR 107.

44.     The groundwater pumping and dewatering approved by BLM in the ROD will

either eliminate or seriously impair the federal reserved water rights and

withdrawn lands, and the uses of these waters and lands, protected by the

SRHA and PWR 107.

45.     The "mitigation" plan to purportedly reduce the adverse impacts to these

waters and lands is largely a plan to monitor the predicted drop in the water

table and only then develop a plan to pipe water to some of the impacted springs. FEIS at 3-88 to -106. Thus, any mitigation plan will not even be considered, let alone implemented, until noticeable drops in the water table (and associated loss of spring flows) have already occurred.

46.    For many of the affected springs, this "mitigation" consists of pumping additional water and installing a series of pipes and infrastructure to purportedly replenish some of the lost water. FEIS Table 3.2.9 (listing mitigation measures), FEIS at 3-93 to -106; FEIS Figure 3.2.21 (map of pipes and springs), FEIS at 3-90.

47.    Even this mitigation is inadequately analyzed. As noted in the FEIS:

> Implementation of the mitigation outlined in Table 3.2-9 would result in up to approximately 37.2 acres of additional surface disturbance associated with road and pipeline construction and maintenance, as well as the need for approximately 302 acre-feet of water that would at least initially come from EML's existing water rights if additional water rights have not yet been secured.

> FEIS at 3-89.

48.    Despite the acknowledgement that an additional "302 acre-feet of water" would be needed for this mitigation, there is no analysis of where this water will come from, or the impacts from its withdrawal. Although BLM says that this water "would at least initially come from EML's existing water rights," Id., there is no analysis of the reasonable likelihood that EML will need this additional water.

49.    The U.S. EPA, in its comments on the FEIS, was strongly critical of this omission:

Section 3.2.3 of the Final EIS indicates the approximate environmental impact associated with the implementation of the proposed surface water quantity mitigation measures. The impacts identified only consider surface disturbance for infrastructure construction. The Final EIS states that the water supply for the up to 302 acre feet per year (afy) of mitigation water would come from EML's current groundwater allocation of 11,300 afy until an alternative source for this water is identified. It is likely that any alternative source would also be groundwater. The Final EIS does not discuss the additional impact that this mitigation would have upon groundwater levels should the entire 302 afy be supplied by groundwater extraction in excess of EML's current allocation.

November 13, 2012 EPA comment letter to BLM, at 2.  The 302 afy of additional water equals more than 98.4 million gallons of water needed per year.

50.     To cure this NEPA deficiency, EPA recommended that:

The Supplemental FEIS or ROD should include the results of revised groundwater modeling showing the additional groundwater drawdown impacts that would result from the up to 302 afy of additional groundwater extraction required to replace lost surface water flows. Alternatively, it should include a restriction that all mitigation water be diverted from EML's existing 11,300 afy water rights.

EPA Nov. 13, 2012 letter at 2.  BLM never prepared the Supplemental FEIS requested by EPA, nor provided the needed analysis.

51.     Despite the purported "mitigation" of some of the water losses to some of the affected waters, other springs will be permanently lost (including PWR 107 springs), as noted above, due to the location of the Project's waste dumps and other facilities.  For example, Springs 619, 639, and 646 (and likely 612), will no longer exist and the only "mitigation" for their complete loss is a plan to "install a guzzler east of the Project fence and west of SR [State Route] 278 designed for large game," or "install a guzzler designed for large game."

FEIS Table 3.2.9.  As noted above, based on the FEIS, it also appears that other springs will be unusable due to the location of Project facilities (e.g., Springs 597 and 604).

52.    For the Springs to be covered and destroyed by Project facilities, no mention is made of keeping these lands open for stockwatering or public use, as required by the SRHA and PWR 107.  The "mitigation" plan to "install a guzzler for large game" fails to protect the current uses of livestock use, which is acknowledged to be a current use of these springs. *See* Table 3.2.9.

53.    There is no support provided as to whether the mitigation for surface waters will be effective.  Although the FEIS states that all of these mitigation measures will be "effective," or "highly effective," no supporting scientific analysis is provided.  FEIS Table 3.2-9.

54.    For example, the only "mitigation" for the loss of the PWR springs to be destroyed by the Project facilities is the installation of a wildlife guzzler to be located near the Project.  No analysis is given to support the assertion that this will be "highly effective" in attracting and sustaining wildlife, particularly when the new guzzlers will be located in many instances within the Project boundary and adjacent to Project facilities such as dirt/rock dumps.  *Compare* FEIS Figure 3.2.21 (location of guzzlers), with Figure 2.1.5 (Project facilities).  In addition, the wildlife guzzler is not intended to mitigate for the elimination of livestock watering.  FEIS Table 3.2-9 (guzzler "designed for large game," not livestock).

55.     In addition to surface waters, BLM also failed to fully analyze and protect ground waters that will be eliminated or severely impacted by the Project.  For example, for ground water, BLM stated that: "BLM would not address or mitigate impacts to water rights."  FEIS at 3-107.  Instead, BLM defers this analysis to the NDEP (Nevada Division of Environmental Protection).  Yet, under NEPA, BLM cannot defer NEPA-mandated analysis to state agencies without any NEPA responsibilities (or to documents/analysis not subject to NEPA's procedural safeguards).

56.     "Mining the open pit would result in an excavation of approximately 2,300 feet below the existing water table, which would be approximately 2,640 beneath the natural surface."  FEIS at 2-86.  "The pit lake that is anticipated to form in the open pit is expected to fill slowly (Figure 3.3.12) and would be 900 feet deep at 200 years after the end of mining."  FEIS at 3-220.  It would eventually be over 1,100 feet deep.  Figure 3.3.12.

57.     Water quality in the pit lake is predicted to exceed federal and state water quality standards for a number of pollutants.

Of constituents that are regulated by the State of Nevada, fluoride, SO4 (Figure 3.3.14), Cd, Mn (Figure 3.3.15), Sb, and Zn (Figure 3.3.16) are expected to be near or above Nevada reference standards and EPA drinking water MCLs Table 3.3-3 water quality criteria (Table 3.3-1).

Initial pit lake water quality is predicted to be good and would meet Nevada enforceable DWS [Drinking Water Standards].  As evaporation from the lake surface concentrates the dissolved minerals, some water quality constituent concentrations would be predicted to increase over time relative to baseline concentrations and to exceed the present Nevada water quality standards (see Table 3.3-1).  The pit lake would be a water of the State of

Nevada, and applicable water quality standards would depend on the present and potential beneficial uses of the lake.

FEIS 3-220.

58.    Despite this, "No mitigation is proposed for this impact."  FEIS at 3-220. This is because, according to BLM, "[t]here would be a low potential for impacts to ground water quality due to the formation of a ground water sink in the open pit under the Proposed Action."  Id. According to the FEIS, because "[a]ccess to the open pit by humans and livestock would be restricted," there is no need to mitigate against, or prevent, the violation of water quality standards in the pit lake.  Id.

59.    However, the "low potential for impacts to ground water quality" does not equate to "no potential for impacts."  Further, the fact that the pit lake would not be accessible for humans and livestock during the life of the mine does not mean that such will always be the case in the future.

60.    BLM's statement that there is a "low potential" for water in the pit lake to migrate to the groundwater does not equate to a similar purported low potential for future water users to use the water in the pit lake.  BLM did not analyze the scenario that water in the pit could be used in the future in the same time frames that it analyzed pit lake levels.

61.    The fact that the waters of the pit lake may not be a source of water for human, irrigation, livestock or other uses currently or in the near future does not mean that this will always be the case.  This is especially true in arid

22

Nevada, as there is a potential for future need of the water in the pit lake, a potential which the FEIS failed to recognize or analyze.

62.     Although BLM analyzed the groundwater depletion and its effects, and the creation of the pit lake, for over 400 years in the future (*see, e.g.*, Figure 3.3.12 showing the water level rise in the pit lake past 600 years), it failed to consider the potential future uses of the contaminated water that will form in the pit lake for any similar or significant length of time.

63.     As noted herein, under FLPMA and its mining regulations, BLM is under an obligation to disapprove a mining project that has the potential to violate federal or state water quality standards.  Further, under NEPA, BLM is under an obligation to fully review all potential impacts and conditions, and analyze mitigation for all impacts, including mitigation effectiveness.  The failure to take this hard look at mitigation for the contaminated pit lake, and the failure to prevent the pit lake from violating water quality standards, violates NEPA and FLPMA.

64.     These Project facilities and impacts will also significantly degrade, if not eliminate altogether, other important public land resources at and near the Project site including significant wildlife, recreation, ranching/grazing, water, air, and cultural/historical resources.

65.     In addition to the dewatering of the aquifer and loss of water rights and associated lands within the Project boundary, the Project will eliminate grazing and public access to the site.  "The constructed fence would exclude

livestock grazing during mine operations and reclamation for approximately

70 years." FEIS at 3-421.

66.     Regarding cultural/historical resources, the FEIS acknowledges that the

Project will have significant adverse impacts to cultural/historical sites

eligible for the National Register of Historic Places under the National

Historic Preservation Act:

> Implementation of the Proposed Action would result in adverse effects to 83
> officially eligible sites within the area of direct impacts. Outside of this area
> but within the Project APE [Area of Potential Effect], this action would also
> have indirect impacts on 180 officially eligible and one unevaluated site....
> These direct impacts are considered to be significant.

FEIS at 3-604.

67.     Despite this, BLM allowed EML to defer the submittal of a "treatment plan"

to mitigate for these significant impacts to after the EIS process was

completed. "EML would develop, and submit to the BLM for approval, a

treatment plan to address the potential direct impacts to the 83 officially

eligible sites within the Project APE. EML would implement the treatment

plan prior to any surface disturbance of eligible sites within the area of direct

impacts." FEIS at 3-604. "The implementation of the treatment plan under

the mitigation measure would be effective at lessening the impact." FEIS at

ES-43 (Table ES-1). *See also* FEIS at 4-68 to -69, relying on the future

"treatment plan" to supposedly mitigate cumulative impacts to these

resources. BLM provides no support for its assertions of effectiveness.

68.     The required treatment plan was not "developed by EML" until October 25,

        2012, weeks after the Final EIS was completed, and over 10 months after the

        Draft EIS was available for public review in December, 2011. *See* ROD at 17.

        Neither the Plaintiffs, nor the public, had any opportunity to comment upon

        the treatment plan (or its effectiveness) that BLM relied upon as alleged

        mitigation for the significant adverse impacts to eligible cultural/historic sites.

69.     The Project, including the new powerlines/ROWs, would significantly impact

        the Pony Express National Historic Trail.  The Trail was officially designated

        by Congress pursuant to the National Trails System Act, 16 U.S.C. §§ 1241 *et*

        *seq*.  Portions of the Trail within the Project site have been determined to be

        eligible for listing on the National Register of Historic Sites.  FEIS at 3-587 to

        -588.  The Pony Express Trail currently crosses public lands near the base of

        Mt. Hope.  FEIS Figure 2.1.5.  The Project would locate the tailings dump and

        southern waste rock dump (Non-PAG WRDF) within a few hundred feet of

        the Trail and bisect the Trail with the powerlines – destroying the historical

        value of the Trail and preventing the general public from using the Trail due

        to the fencing around the Project and safety concerns.  The FEIS admits that

        the "mitigation" proposed for the Trail, largely photo-documenting the current

        Trail before the Project begins, "is not likely" to reduce the impact below the

        finding of "significant" impacts.  FEIS at 3-592.

70.     The massive disturbance and impacts to surface and ground waters and public

        land resources must be "reclaimed" pursuant to BLM mining regulations at 43

CFR Part 3809.  Reclamation is projected to last 30 years after mining ceases. ROD at 1.  As part of this mitigation measure, the ROD approved the imposition of financial guarantees (FG) to cover reclamation costs for the Project, including the ROWs.  ROD at 30-35.

71.     The base reclamation FG approved in the ROD is $73,360,363.  ROD at 30. The base reclamation FG for the ROWs was set at $1,037,694.  ROD at 34.

72.     The FG's include the establishment of a Long Term Funding Mechanism (LTFM) to purportedly cover the costs "for post-reclamation obligations (including long-term monitoring and mitigation) associated with the closure process of the Mount Hope Project." ROD at 31.  "Total cost of the mitigation and monitoring over the 500 year period is anticipated to be $83,202,396." ROD at 31.

73.     As noted by EPA, in urging BLM to comply with NEPA in the review and establishment of the FGs:

The Draft EIS states that drain-down solutions from the tailings storage facilities are expected to contain aluminum, antimony, cadmium, fluoride, manganese, molybdenum, and sulfate concentrations that exceed water quality standards, and will become acidic over time. Waste rock seepage will contain high concentrations of aluminum, arsenic, cadmium, fluoride, manganese, nickel, zinc, copper, iron, lead, beryllium, thallium, selenium, sulfate, and total dissolved solids. If tailings and waste rock disposal facilities, fluid collection systems, and evapotranspiration cells  are not properly managed over the long-term, the project could result in significant and long-term degradation of surface water and/or groundwater quality, as well as wildlife exposure to these waters.

March 28, 2012 EPA letter to BLM at 1.

74.     Despite the fact that the reclamation FGs are considered mitigation measures needed to purportedly ensure that the Project complies with federal law, BLM never reviewed the consideration or establishment of the FGs under NEPA. The Plaintiffs and general public were never allowed to see the proposed FGs during the NEPA process, and were never allowed to comment upon these measures, including whether they were adequate and/or would be effective in protecting public resources.

75.     The U.S. EPA, in its formal comments upon the Draft EIS as mandated by federal law, notified BLM that the failure to include information regarding the reclamation FGs for public review violated NEPA.

76.     EPA stated:

The Draft EIS is inadequate because it does not disclose any detail on how BLM will ensure that funds will be available as long as they are needed to implement the closure and post-closure obligations. The availability of adequate resources to ensure effective reclamation, closure, and post-closure management is a critical factor in determining the significance of the project's potential impacts and its environmental acceptability. An adequate reclamation/closure bond and post-closure funding mechanism are needed to ensure that the costs of stabilizing, reclaiming, and managing the site after closure are covered by the mine operator for as   long as necessary. If mitigation funds would not be adequate to effectively protect environmental resources from significant and long-term degradation, the project would be environmentally unacceptable.

EPA continues to believe that the adequacy of financial assurance is a critical element to be addressed in the NEPA process and should be disclosed. We believe such disclosure is consistent with CEQ guidance, which states that all relevant, reasonable mitigation measures that could improve the project are to be identified in an EIS and, to ensure that environmental effects of a proposed action are fairly assessed, the probability of the mitigation measures being implemented should also be discussed.

March 28, 2012, EPA comments to BLM, at 2.  Despite this, BLM never

included any discussion as to the adequacy, amount, or effectiveness of the

FGs in either the Draft or Final EIS.

77.       The Project received strong objections from EPA, Eureka County, and the

local ranching and farming communities, as well as Plaintiffs.  *See*, *e.g.*, FEIS

Appendix H (summaries of public comment letters on Draft EIS).

78.       In their comments on the Draft EIS, the Eureka County Commissioners

highlighted the Project's severe impacts on ground and surface waters and

BLM's failure to fully review and protect these resources:

> The affected natural resource that pervades the entire project and its
> surrounding environment is water.   The DEIS's failure to treat this
> resource with requisite attention, detail, and quantification affects the
> sustainability of this resource on its own; but perhaps more importantly, **the
> failure to protect water produces a failure to protect resources
> critical to Eureka County agriculture and recreation and the health and
> wellbeing of the County's residents.** The County highlights as an
> example the superficial treatment of proposed dewatering of Roberts
> Creek (including the corollary of increasing groundwater extraction to
> pipe that substitute supply into the creek as a mitigation measure). The
> County questions the DEIS's assertion that reduction in creek flow will
> not become significant   until the stream is completely dewatered; and
> the corollary suggestion that expanding groundwater extraction, beyond
> that already specified for direct application to mining operations, and
> lacing the landscape with pipes, would provide worthy or effective
> mitigation.

February 28, 2012 letter from Eureka County to BLM, at 2 (Included in

Appendix H to FEIS as comment # 803) (emphasis added).

79.       Due to the legal and factual deficiencies of the Draft EIS, the EPA determined

that the Draft EIS contained "inadequate information" and requested that

BLM prepare a revised or Supplemental Draft EIS instead of proceeding to

issue the Final EIS.  March 28, 2012 EPA letter.  BLM refused this request

and issued the FEIS over EPA's objections.

80.      After the publication of the Final EIS, EPA found it to be legally deficient as

well, and requested BLM to prepare a Supplemental Final EIS before

approving the Project (i.e., issuing the ROD).  *See* EPA letter to BLM,

November 13, 2012.  BLM refused this request and shortly thereafter

approved the Project via the issuance of the ROD on November 16, 2012.

81.      As EPA stated in its November 13, 2012 letter to BLM, the FEIS failed to

comply with NEPA, as did the Draft EIS:

> With regard to a number of other important issues, EPA finds that the Final
> EIS does not contain revisions responsive to the comments provided on the
> Draft EIS. In particular, the discussion regarding post-closure financial
> assurance requirements remains far too general and the EIS continues to lack a
> quantitative discussion of the trust fund requirement.  As a result, the Final
> EIS does not adequately disclose information critical to determining the
> project's long term environmental consequences. For this reason, EPA finds
> the Final EIS to be unresponsive to our comments and we continue to
> recommend that the EIS be formally supplemented to address our previous
> comments.

82.      EPA further noted BLM's refusal to consider the financial assurance

mitigation measures in the FEIS:

> EPA continues to strongly believe that the adequacy of financial assurance
> is a critical element to be addressed earlier in the NEPA process so that the
> potential environmental and fiscal consequences of the proposed project
> are disclosed to the public. As you know, BLM Nevada did provide
> financial assurance information in the 2002 EIS for the Phoenix Mine,
> which included approximate annual engineering costs and the amount of
> seed money needed to generate sufficient funds into the future to satisfy
> the cost estimate.

EPA November 13, 2012 letter to BLM at 2.

83.     The ROD also authorizes EML to receive and process concentrates/ore from

other mines in the region, known as "toll roasting." ROD at 6.  "EML

proposes to toll roast (the practice of processing another party's concentrate at

another facility for a specified price) Mo concentrates produced by other

mines to productively utilize the full capacity of the roaster at a rate of

approximately seven 22-ton capacity highway trucks per day."  FEIS at 2-38.

However, the FEIS contains no analysis of the sources of this ore (i.e., the

"other mines"), the impacts from these operations, or the full extent of the

transportation and other impacts from this approval.

84.     The EPA noted the NEPA violations inherent in the failures to fully analyze

the impacts associated with toll roasting:

> The proposed Mount Hope Mine would toll roast molybdenum ore from
> other mines, involving delivery of up to seven 22-ton capacity highway
> trucks per day, and off-site transport of up to nine 22-ton capacity
> highway trucks every two days. The Draft EIS does not include
> additional information regarding the potential sources of this off-site ore
> or the estimated vehicle miles traveled associated with it. It is also unclear
> whether the emissions associated with on-site and off-site delivery of toll
> roast ore, process chemicals, fuels, etc., have been accounted for in the
> criteria pollutant emissions estimates for the proposed project and
> alternatives.

EPA March 28, 2012 comment letter to BLM.  Despite this, BLM never

included the required analysis.  BLM argued that it would not "speculate" as

to where these ores would originate from, yet approved EML's option to

conduct these operations anyway.  "The identification of the potential sources

of these off-site (toll) ores is not possible and cannot be quantified. NEPA

does not require the EIS to speculate on potential sources of ore concentrate."

FEIS Appendix H, at 424 (response to EPA comment letter 941, comment 72).

85.     Because BLM approved the toll roasting and its impacts, it was required under NEPA to fully analyze all of these aspects of the roasting.

86.     Regarding air quality and air pollution, BLM admits that it did not obtain any data regarding the existing, or baseline, levels of air pollutant levels at or near the Project site.  FEIS at 3-288.  Adequate and accurate data and analysis of baseline/background levels must be obtained and made available to the public in the Draft and Final EIS under NEPA.

87.     Although "complete full year (2010) hourly on-site meteorological data" to analyze baseline **meteorological** conditions was obtained, FEIS at 3-282, no such data or analysis was obtained for baseline **air pollutant** levels.

88.     BLM admits that such data is necessary to determine the Project's impacts and also to ensure that the Project does not have the potential to violate any air quality standard.

To assess the impact of the Project on the ambient air quality, it was necessary to account for existing, or background, levels for each pollutant. No monitoring has been performed within the Project Area for ambient concentrations of CO, $NO_2$, $O_3$, or $SO_2$, nor does the BAPC specify background concentrations for these pollutants.  However, background values are necessary for the purpose of comparing modeled results to the NAAQS [National Ambient Air Quality Standards] and NSAAQS [Nevada State Ambient Air Quality Standards].

FEIS at 3-288.

89.     Instead, for some pollutants, such as $PM_{10}$ and $PM_{2.5}$, BLM used data from Great Basin National Park, a protected environment well over 100 miles

away.  FEIS at 3-288, Table 3.6-7.  Even this is confusing, as the FEIS states in another section that the closest state air monitoring location for $PM_{10}$ is "in Elko, Nevada, which is approximately 75 miles northeast" of the Project site. FEIS at 3-277.  BLM offers no scientific support for its decision to use conditions in a relatively pristine environment located in a distant National Park as a substitute for site-specific baseline conditions at the Project site, located in an active agricultural and commercial region next to a State Highway.

90.     For $SO_2$, BLM used data from Boulder City, near Las Vegas, well over 200 miles away.  FEIS Table 3.6-7.  For other "criteria pollutants" regulated under the federal and state Clean Air Acts (CO, $NO_2$, and some forms of $SO_2$), BLM assumed that the existing level of pollutant was zero, based on a communication with a state air quality agency employee in 2007 and 2008. Id.

91.     BLM combined these figures to calculate the predicted air pollution emissions from the Project.  FEIS at 3-292, Table 3.6-9.  BLM then concluded that none of the predicted levels of these criteria pollutants (combined with the background levels) would be above the applicable standards.  Id.

92.     Yet without adequate baseline data, this conclusion is unsupportable.  For example, for $NO_2$, a noxious gas produced by a variety of sources, BLM predicts that the Project will emit 162.1 $u$g/m$^3$, over 86% of the 1-Hour Clean Air Act standard of 188 $u$g/m$^3$.  Table 3.6-9.  Yet this is based on a

background baseline level of zero, which as noted above is not based on any measurement or data.

93.     This reliance on "zero" for background conditions of $NO_2$, as with the other pollutants, contradicts the record and other admissions in the FEIS.  For example, BLM admits that there are other sources of $NO_2$ emissions in the area.  In its discussion of the no-action alternative (i.e., no Project approval), BLM admits that: "Combustion of diesel in the trucks and drilling rigs can produce elevated levels of CO, $NO_2$, $SO_2$, $PM_{10}$, $PM_{2.5}$, and $O_3$.  The amount of these emissions under the No Action Alternative would be substantially less than under the Proposed Action."  FEIS at 3-305.  Although no analysis is provided to show how "substantially less" the current/background emissions are (itself a violation of NEPA's mandate to analyze these issues), it is clear that they are more than "zero."

94.     BLM's unsupported conclusion that background levels of $NO_2$ (and other pollutants) is zero is further undermined by the fact that the Project site abuts State Highway 278.  Figure 2.1.5 (showing Highway 278 within the eastern side of the Project boundary).  As noted above, "combustion of diesel in the trucks" is a source of $NO_2$.  FEIS at 3-305.  BLM's conclusion that there are no emissions from trucks on Rte. 278 (i.e., zero background levels) is groundless.

95.     Additionally, the FEIS acknowledges that other sources of air pollution in the "Cumulative Effects Study Area (CESA)" for air emissions emit the criteria

pollutants that BLM either assumed were zero or were based on data from in many cases well over a hundred miles away.  For example, BLM admits that mining, oil and gas, agriculture and commercial operations in the area all "generate fugitive dust and combustion emissions."  FEIS at 4-54.  *See also, e.g.,* Figure 4.3.5, FEIS at 4-45 (showing mineral and oil and gas projects within the air quality CESA).

96.     The U.S. EPA specifically advised BLM that the failure to conduct baseline analysis and obtain baseline data violates NEPA:

> In modeling the project's potential impacts to air quality resources, the Draft EIS used monitor locations in Boulder City, Nevada and Jean, Nevada to provide background concentrations for the criteria pollutants $CO$, $NO_2$, and $SO_2$. The Final EIS, however, substitutes a value of zero for $CO$, $NO_2$, and $SO_2$ (1-hour and 3-hour) background concentrations. We understand that the citations provided for this change are personal communications with two individuals at the Nevada Bureau of Air Pollution Control on March 19, 2007 and March 19, 2008. EPA is concerned that a background concentration of zero for these pollutants may be too low to be accurately representative.

November 13, 2012 EPA comments on FEIS to BLM at 2.

97.     Despite these errors and omissions, BLM nevertheless concluded that the Project would not result in any potential violation of federal or state air quality standards and related laws.  *See* FEIS Section 3.6 (air quality).

98.     Also because of these erroneous assumptions and conclusions, BLM did not prepare or consider any mitigation measures for these air emissions.  "No mitigation is proposed for this impact."  FEIS at 3-293 (for $PM_{10}$, $PM_{2.5}$ and Pb emissions); FEIS at 3-294 (for combustion emissions of $CO$, $NO_2$, $SO_2$, $PM_{10}$, $PM_{2.5}$ and VOCs (Volatile Organic Compounds).

99.     In addition, BLM calculated the Project's potential air emissions at the extreme edge of the Project boundary, without considering the air pollution levels or impacts within the Project site, or how emissions would affect workers and visitors.  FEIS at 3-295, Figure 3.6.4.

100.    NEPA also requires that BLM conduct a complete analysis of all "cumulative effects," or "cumulative impacts."  NEPA's obligation to consider cumulative impacts extends to all "past," "present," and "reasonably foreseeable" future activities.  40 CFR § 1508.7.  This analysis must include project-specific cumulative data, a quantified assessment of other projects' combined environmental impacts, and objective quantification of the impacts from other past, existing and proposed activities within the Cumulative Effect Study Area (CESA).

101.    Although the FEIS admits that there will be cumulative effects/impacts from various other mining, oil and gas, agricultural, commercial, and other activities, there is no detailed discussion about the actual impacts from these activities.  FEIS Section 4, at 4-1 to -104.  Instead, the FEIS largely lists these activities, notes that they will result in cumulative impacts along with the Project to various resources (e.g., air, water, wildlife, cultural/historical), provides a summary of the acreages of these activities, and a cursory mention of impacts.  *See, e.g.*, Table 4.2-2, FEIS at 4-10 to -12, listing types of activities that will cause cumulative impacts.

102.     Nowhere does the FEIS provide the quantified assessment of the impacts from these activities as required by NEPA.

103.     The lack of any quantified analysis or data of the cumulative air emissions from the activities within the air quality CESA is especially problematic when coupled with the above-noted lack of any baseline data or analysis of air quality at and near the Project site.

104.     For these and the related reasons addressed herein, Plaintiffs ask this court to declare that the ROD, FEIS, and Project/ROW/FG approvals and decisions signed and prepared by BLM for the Project are in violation of federal law. Plaintiffs ask this court to vacate and remand the decisions to the BLM for reconsideration in accordance with federal law, and enjoin any construction, operation, or development of the Project pending compliance with federal law.

<u>JURISDICTION AND VENUE</u>

105.     This is a suit pursuant to the APA, FLPMA, NEPA, Public Water Reserve 107, the Stock Raising Homestead Act, and other federal statutes and requirements.  Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question), § 2201 (declaratory relief), and § 2202 (injunctive relief).

106.     Venue is properly before the District of Nevada pursuant to 28 U.S.C. §§ 1391 (b) and (e).  The Mt. Lewis BLM office, BLM State Director, and named defendants Christopher Cook and Amy Lueders, who issued the challenged decisions, are located in Nevada.  The Mt. Hope Project is located in Eureka County, Nevada.

<u>PARTIES</u>

107.     Plaintiff Great Basin Resource Watch (GBRW) is a nonprofit organization based in Reno, Nevada that is concerned with protecting the Great Basin's land, air, water, wildlife and communities from the adverse impacts of hardrock mining.  GBMW is a coalition of ranchers, sportsmen, conservationists, and Native Americans dedicated to protecting the communities, land, air, water and Native American resources of the Great Basin.  Members of GBRW have used, enjoyed, and valued the area of the Project, including the Project site, for many years.  Members of GBRW utilize springs and waterholes on BLM land in Nevada for stockwatering and other water-related purposes.  Members of GBRW hike, view and photograph wild plant and animal life, and generally enjoy using the area of the Project for recreational, historical, conservation, and aesthetic purposes.  Members of GBRW intend on continuing to use and value the lands at, and affected by, the Project during 2013 and in future years.  These uses will be immediately, irreparably, and significantly harmed by the Project and related operations.

108.     Members of GBRW include ranchers and farmers living and working on, and owning, the closest private lands to the Project.  These members graze and water stock in the Mt. Hope area, and own water rights in the area and intend on continuing these uses as they have done since their families first homesteaded the area in the 1860s.  These uses will be immediately,

irreparably, and significantly harmed by the Project, including the loss of

public water reserves and the lands protected by PWR 107.

109.    GBRW submitted comments to the BLM regarding the Draft EIS and filed a

petition for review of the Project approval decisions and FEIS with the BLM

State Director, which was rejected on January 4, 2013.

110.    Plaintiff Western Shoshone Defense Project (WSDP) is under the direction of

the Western Shoshone National Council, a traditional government of the

Western Shoshone people.  Its mission is to protect and preserve Western

Shoshone rights and homelands for present and future generations based upon

cultural and spiritual traditions.  WSDP staff operate under the guidance of a

director; the Western Shoshone National Council, whose members represent

various Western Shoshone communities and organizations; and a Community

Advisory Board with members from Western Shoshone communities.  Along

with GBRW, WSDP filed the petition for State Director review, which was

rejected by the BLM State Director.  WSDP and its members have concrete

and significant interests in the lands affected by the Project, and regularly use

these lands for traditional, cultural, and religious uses.  These interests will be

negatively affected, and many will be eliminated, by the Project.

111.    Members of WSDP have used, enjoyed, and valued the area of the Project,

including the Project site.  Members of WSDP utilize springs and waterholes

on BLM land in Nevada for stockwatering and other water-related purposes.

Members of WSDP use the area of the Project for cultural, religious,

historical, recreational, conservation, and aesthetic purposes.  Members of WSDP intend on continuing to use and value the lands at, and affected by, the Project during 2013 and in future years.  These uses will be immediately, irreparably, and significantly harmed by the Project and related operations.

112.     In addition, GBRW and WSDP, and their members have been, and are being, irreparably harmed by BLM's failure to conduct a proper NEPA analysis and to fully involve the public, and GBRW/WSDP and their members, in the required NEPA process.

113.     Defendant Bureau of Land Management (BLM) is an agency of the defendant United States Department of the Interior. The Mt. Lewis Field Office of the BLM issued the ROD, FEIS, ROW's and FGs for the Project.  The BLM has oversight responsibility for the federal lands affected by the Project.  Defendant Christopher Cook, the Manager of the BLM Mt. Lewis Field Office, signed the ROD, which included the ROWs and FGs, and his office issued the FEIS for the Project.  BLM State Director Amy Lueders, after receiving the petition filed by GBRW and WSDP, stated: "I have reviewed your request and taken a hard look at your statement of reasons.  Based on my review, I am declining your request for a SDR of the MLFM [Mount Lewis Field Manager] decision."  January 4, 2013 State Director Decision.

<u>LEGAL REQUIREMENTS AND BACKGROUND</u>

<u>Public Water Reserve # 107 and Related Laws</u>

114. The ground water withdrawals associated with the Project are predicted to cause many springs and/or waterholes to be eliminated or have substantially reduced flows.  The BLM must ensure that these springs and/or waterholes are not impaired by the Project, particularly the dewatering.  Springs and waterholes on public land in the West are reserved for public use by Public Water Reserve No. 107 ("PWR #107"). Executive Order of Apr. 17, 1926, previously codified at 43 C.F.R. § 292.1 (1938).  <u>See also</u> GENERAL LAND OFFICE, DEPARTMENT OF INTERIOR, CIRCULAR 1066, 51 I.D. 457-58 (1926) (stating "[t]he above order [PWR #107] was designed to preserve for general public use and benefit unreserved public lands containing water holes or other bodies of water needed or used by the public for watering purposes").  The Executive Order withdrew all springs and water holes on public lands and the surrounding acreage (the smallest legal subdivision or all lands within one quarter mile for unsurveyed lands).  It was designed to preserve for the general public lands containing water holes and other bodies of water needed or used by the public for water-related purposes.

115. The 1926 Executive Order stated: "it is hereby ordered that every smallest legal subdivision of the public-land surveys which is vacant unappropriated unreserved public land and contains a spring or water hole, and all land within one quarter of a mile of every spring or water hole located on unsurveyed

public land be, and the same is hereby, withdrawn from settlement, location, sale, or entry, and reserved for public use in accordance with section 10 of the act of December 29, 1916 (39 Stat. 865)." 43 C.F.R. § 292.1 (1938).

116.     Under this Executive Order and related laws, BLM cannot authorize activities that will impair the public use of any reserved waters and/or lands.  BLM's approval of dewatering, and other activities associated with the Project, which could dry up or materially reduce springs and waterholes protected by PWR 107 is not in compliance with these requirements.

117.     BLM cannot dispose of federal property such as PWR 107 reserved water rights without congressional authorization, which authorization has not occurred here.

118.     In addition, this Executive Order, related laws, and FLPMA prevents the federal government from allowing a mining operation to diminish any of the reserved waters.  These waters are held pursuant to a federal reserved water right and are to be used (and protected by BLM) for the purposes of the reservation—i.e. public watering uses.  Federal reserved water rights derive from federal reservations.  Removing the water from these springs and/or waterholes, as a result of groundwater withdrawals from the Project or any other related activity, is prohibited.

119.     Springs and/or waterholes that will be affected by the Project's dewatering and other operations are utilized by livestock grazing on public land.  Public lands at and near the Project, and public land and waters covered by the 1926

Executive Order and potentially affected by groundwater pumping, are covered by grazing allotments and permits issued by the BLM. FEIS at 3-149 (Figure 3.12.1).  The elimination or reduction of water flow at springs and/or waterholes would adversely affect the ability of livestock to utilize those water sources in the future.  Reduction or loss of water flow in springs and/or waterholes used by livestock would result in the displacement of livestock from the site, and/or concentrating livestock at water sources not affected by dewatering.

120.     Destruction or loss of the reserved waters and withdrawn lands under PWR 107, including the location of Project facilities within the withdrawn lands, and/or the preclusion of public access via fencing, is prohibited under PWR 107, FLPMA, and the SRHA.

121.     Failure to review and fully protect the reserved water rights, waters, springs and water holes, related withdrawn lands, and public uses of these lands and waters, violates PWR 107, the SHRA, and BLM's duty under FLPMA to "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. §1732(b).

122.     The 1926 Executive Order and withdrawal were promulgated under the authority of Section 10 of the Stock-Raising Homestead Act of 1916, 39 Stat. 865, which provided that withdrawn "lands containing water holes or other bodies of water needed or used by the public for watering purposes … shall, while so reserved, be kept and held open to the public use for such

purposes…."  Although the Stock-Raising Homestead Act and the underlying authority of the President to withdraw such lands pursuant to the Pickett Act of 1910, 36 Stat. 847, was repealed by FLPMA in 1976, withdrawals (such as the 1926 Executive Order) made pursuant to those authorities remain in force today. 43 U.S.C. §1701 note.

123.     In addition, BLM did not ensure that the Project will not disturb public lands withdrawn by the 1926 Executive Order in contravention of the purposes for which the land was withdrawn.

124.     Under the Pickett Act, lands containing valuable deposits of "metalliferous minerals" were not withdrawn from the operation of federal mining laws, including the Mining Law of 1872, 30 U.S.C. § § 21-47.  Since the repeal of that provision of the Pickett Act in 1976, lands withdrawn under PWR 107 were no longer open for any location of any mining claim, regardless of the type of mineral contained within the claim.

125.     BLM cannot approve a mining operation on withdrawn lands, such as the Project, unless the valid claims proposed for use were filed before the date of PWR 107 or if the valid claims were located prior to FLPMA's repeal of the Pickett Act in 1976, contain valid discoveries of deposits of metalliferous minerals.  Any claims filed or located after FLPMA within lands withdrawn by PWR 107 are null and void.

126.     The subject mining claims covering the PWR springs, and lands within ¼ mile of each PWR noted above (or within the 40 withdrawn acres whichever is applicable) were not claimed prior to the 1926 Executive Order.

127.     All of the mining claims covering the PWR springs, and the lands within ¼ mile of each PWR spring (or within the 40 withdrawn acres whichever is applicable ) were claimed after the enactment of FLPMA in 1976.  *See* EML's April 25, 2008 "Feasibility Study" for the Project, at 1-24 to -27:

http://www.generalmoly.com/pdf/mount_hope_ni_43-101.pdf (last viewed February 9, 2013).

128.     Thus, BLM's approval of the placement of any Project facility within these withdrawn lands is illegal under PWR 107, the SRHA, and FLPMA.

129.     In the alternative, if the repeal of the Pickett Act did not eliminate the provision keeping these withdrawn lands open for the location and development of "metalliferous minerals," then the lands are only open for activities associated with valuable deposits of such minerals.

130.     There is no evidence in the FEIS or elsewhere in the public record that shows that the mining and/or millsite claims covering the PWR springs, and the withdrawn lands around the PWR springs, contain valuable deposits of metalliferous minerals.  Under the 1872 Mining Law, only claims for metalliferous minerals that contain "valuable mineral deposits" are valid against the United States.  30 U.S.C. § 22.

131.     The lands within ¼ mile (or within the withdrawn 40 acres) of springs # 597,
         604, 612, 619, 646, and 742 do not contain valuable mineral deposits of
         metalliferous minerals within the limits of the mining claims covering these
         lands.

132.     Unless the withdrawn lands surrounding the PWR springs contain a valuable
         deposit of metalliferous minerals on each claim, they are not open under the
         provision of the Pickett Act (if still applicable) and are withdrawn from entry
         under PWR 107 and the SRHA and BLM cannot approve the location of any
         Project facilities or operations on those lands.

133.     Although, as noted above, BLM briefly mentioned some (but not all) of the
         waters reserved under PWR 107, the FEIS contains no analysis of whether the
         lands withdrawn and protected by PWR 107 contain valuable deposits of
         metalliferous minerals, in violation of NEPA, FLPMA, PWR 107, and the
         SRHA.

134.     BLM has not considered, or determined, whether the claims covering the
         PWR springs (and withdrawn lands around the springs, whether ¼ mile or 40
         acres) contain valuable deposits of metalliferous minerals.  Yet BLM
         approved the location of Project facilities on these withdrawn lands.

135.     Indeed, based on the fact that the only mining claims to be excavated by the
         Project are located within the confines of the mine pit, it is reasonable to
         assume that the claims at and surrounding the PWR springs (i.e. within ¼ mile
         or within 40 acres around the springs), many of which will be buried by

hundreds of millions of tons of waste rock, do not contain the requisite discovery of valuable mineral deposits. Even assuming that the mining claims covering the mine pit contain a valuable mineral, the record does not show that the claims covering the withdrawn springs and lands, some over a mile away from the mine pit, contain valuable deposits of metalliferous minerals.

136.   Without evidence and a determination that the mining claims covering these lands and waters contain the discovery of a valuable deposit of metalliferous minerals, the mere fact that EML or its affiliates have filed mining or millsite claims on these lands does not mean that these lands and waters are exempt from the PWR 107 withdrawals and protections. BLM's apparent assumption that these lands are exempt from the PWR 107 withdrawal, based on the mere fact of the location of claims on them, is without support in the record and is thus arbitrary and capricious.

137.   As noted above, a number of springs and lands withdrawn by PWR 107 are located with the "footprint" of the Project, including those waters and lands to be buried by the waste rock and rock/soil dumps.

138.   In any event, even if demonstrated valid claims for metalliferous minerals cover all of the public lands at and within ¼ mile of the PWR springs (or within the 40 withdrawn acres whichever is applicable), BLM must ensure that these lands are kept and held open to the public use for watering purposes under the 1926 Executive Order and the Stock Raising Homestead Act.

139.     When approving the Project, BLM did not ensure that the lands would be kept

and held open to the public for watering purposes.  At a minimum, the lands at

and around the PWR 107 springs that will be buried or significantly

compromised have not been held open as required.  This is true for those

lands/waters directly buried and adjacent to the mine facilities, but also any

such lands/waters where access will be precluded by the Project's fence.

The National Environmental Policy Act (NEPA)

140.     NEPA requires federal agencies to prepare an EIS for any proposed major

action that may significantly affect the quality of the environment.  42 U.S.C.

§ 4332(2)(C).  The Council on Environmental Quality ("CEQ") promulgated

uniform regulations to implement NEPA which are binding on all federal

agencies.  40 CFR Part 1500.

141.     Pursuant to the CEQ regulations, agencies must insure the professional

integrity, including scientific integrity of the discussions and analysis in

environmental impact statements.  40 CFR §1502.24 (Methodology and

Scientific Accuracy).   Also, 40 CFR § 1502.1 mandates that NEPA

documents be supported by evidence that the agency has made the necessary

environmental analysis.  Consequently, BLM has a duty to disclose the

underlying scientific data and rationale supporting the conclusions and

assumptions in the FEIS, as well as a duty to accurately and fully respond to

substantive comments submitted to BLM.  Unsupported conclusions and

assumptions violate NEPA.  The BLM violated these requirements in approving the Project and issuing the FEIS.

142.    The BLM is also required to "describe the environment of the areas to be affected or created by the alternatives under consideration."  40 CFR § 1502.15.  The establishment of the baseline conditions of the affected environment is a fundamental requirement of the NEPA process.  BLM's failure to fully analyze all aspects of the baseline conditions at and near the Project site (as well as the sites of the mining operations producing the ores/concentrates to be "toll roasted" at the Project) violates this requirement.

143.    To comply with NEPA, BLM must consider all direct, indirect, and cumulative environmental impacts of the proposed action.  40 CFR § 1502.16; 40 CFR § 1508.8; 40 CFR § 1508.25(c).  Direct effects are caused by the action and occur at the same time and place as the proposed project.  40 CFR § 1508.8(a).  Indirect effects are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  40 CFR § 1508.8(b).  Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." Id.

144.    Cumulative effects are defined as the impacts resulting from the incremental impact of the proposed action when added to other past, present, and reasonably foreseeable future actions. 40 CFR § 1508.7.  Cumulative impacts result from individually minor but collectively significant actions taking place

over a period of time.  Id.  BLM failed to fully consider the direct, indirect and cumulative impacts of and from the Project and these other activities.  Overall, BLM failed to take the required "hard look" at the Project's direct, indirect, and cumulative impacts, as required by NEPA.

145.    "NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 CFR § 1500.1(b).

146.    NEPA requires the BLM to fully analyze all mitigation measures, their effectiveness, and any impacts that might result from their implementation. NEPA regulations require that an EIS: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 CFR § 1502.14(f); and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." 40 CFR § 1502.16(h).  The BLM must fully evaluate the effectiveness and impacts of any mitigation measure it adopts or relies upon in the FEIS or ROD.  As noted herein, that did not occur in this case.

147.    NEPA requires that BLM review mitigation measures as part of the NEPA process -- not in some future decision shielded from public review. 40 CFR 1502.16(h).

148.    For example, BLM failed to analyze any mitigation (let alone its effectiveness) for the pit lake water quality violations and ground water impacts/loss as well as

many of the air pollution emissions.  The purported analysis of "mitigation" (and its effectiveness) for surface water rights, as noted above, was also inadequate.

149.     The mitigation "treatment plan" for impacts to historical and cultural resources, as admitted by BLM, was also not analyzed in the DEIS or FEIS, nor subject to public review during the NEPA process.  It was impossible for the public to review and comment upon this plan, as it has a right to do under NEPA, when it was only produced by the company after the FEIS was completed.

150.     The Financial Guarantees (FGs) for reclamation, water and other mitigation were also not subject to the mandated public process under NEPA.  The public never had the opportunity to review or comment upon the FGs, which violates NEPA's mitigation requirements, as well as the even more fundamental requirement that the public be involved in the review of all aspects of the Project under consideration by BLM.

151.     NEPA requires that BLM review, and the public have the opportunity to review and comment, on all material aspects of the Project and its impacts before decisions are made and before actions are taken, including before issuance of the FEIS.  *See* 40 CFR § 1500.1(b).  That has not occurred in this case.

152.     For example, the FEIS disavows any consideration of the impacts from the "toll roasting" of concentrates/ores at the Project.  There is no mention, let alone analysis, of the impacts from these off-site mines, or a full analysis of the transportation and other impacts from the mining, hauling, and roasting of

these ores.  Thus, BLM failed to review the direct, indirect, and cumulative

impacts associated with the toll roasting.

153.    BLM also failed to consider reasonable alternatives to the Project as approved.

The consideration of alternatives is considered "the heart of the environmental

impact statement."  40 CFR § 1502.14.  BLM failed to analyze and consider

several reasonable alternatives in the FEIS, including: (1) not approving the

"toll roasting" of ore from off-site mining operations; (2) not locating Project

facilities within ¼ mile (or within the 40 withdrawn acres, whichever is

applicable) of springs covered by PWR 107; and (3) additional mitigation

measures to prevent the formation of a mine pit lake that will violate water

quality standards.

The Federal Land Policy and Management Act (FLPMA)

154.    FLPMA requires that: "In managing the public lands the Secretary [of

Interior] shall, by regulation or otherwise, take any action necessary to prevent

unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).  BLM

cannot approve a mining plan of operations that would cause "unnecessary or

undue degradation." 43 CFR § 3809.411(d)(3)(iii).  BLM failed to comply

with these requirements.

155.    In addition, BLM must ensure that all operations comply with the Performance

Standards found at §3809.420. *See* 43 CFR §3809.5 (definition of UUD,

specifying that failing to comply with the Performance Standards set forth at

§3809.420 constitutes UUD).

156.    BLM's Performance Standards for mining further require that all operations

must take mitigation measures "to protect public lands."  43 CFR §

3809.420(a)(4).  Although the ROD and FEIS contains some mitigation

measures to somewhat reduce the Project's impacts, these measures are not

sufficient to "protect public lands" as required by FLPMA and the Subpart

3809 regulations.  In addition, "mitigation" plans that rely primarily on

monitoring of impacts prior to taking any action to reduce or eliminate the

impacts shown by the monitoring, do not constitute "mitigation measures to

protect public lands" since such a scenario is predicated on the adverse impact

first occurring.

157.    One of the most important of these Performance Standards regards BLM's

duties to ensure that all mining operations comply with all environmental

protection standards, including air and water quality standards.  *See, e.g.,* 43

CFR § 3809.5 (definition of UUD includes "fail[ure] to comply with one or

more of the following: … Federal and state laws related to environmental

protection."); § 3809.420(b)(5) (listing Performance Standards that must be

met, including the requirement that "All operators shall comply with

applicable Federal and state water quality standards …").  "All operators

shall comply with applicable Federal and state air quality standards, including

the Clean Air Act (42 U.S.C. 1857 *et seq.*)." § 3809.420(b)(4).

158.    The Project's impacts to Mt. Hope and its environs, including the severe

degradation of and elimination of the PWR 107 waters and lands, as well as

the creation of the mine pit lake that will violate water quality standards, constitutes unnecessary or undue degradation under FLPMA which BLM failed to prevent.

159.     BLM's conclusion that the Project will not violate any applicable air quality standard, as noted above, was based on the lack of credible and accurate information, failed to account for baseline pollutant levels, and otherwise contradicts the record.  As such, BLM has failed to show that the Project will not violate air quality standards, which constitutes unnecessary or undue degradation and a violation of FLPMA and the Part 3809 regulations (in addition to the NEPA violations noted above).

160.     BLM's failure to fully review all direct, indirect, and cumulative impacts and otherwise comply with NEPA also constitutes unnecessary or undue degradation under FLPMA and its implementing regulations.

161.     Overall, BLM's actions, decisions, and conclusions are not based on sufficient evidence, contradict the record, are arbitrary and capricious, and are otherwise not in accordance with law.

<u>FIRST CAUSE OF ACTION</u>

**Failure to Protect Federal Reserved Water Rights and Withdrawn Lands, Unauthorized Disposal of Federal Property in These Waters and Lands, Violation of Public Water Reserve No. 107 and Related Laws**

162.     The allegations in paragraphs 1-161 are reasserted as if fully stated herein.

163.     BLM's actions and omissions in approving the Mt. Hope Project noted above, including the ROD and FEIS, fail to fully protect the waters, and the federal

reserved water rights in the waters, reserved and protected by Public Water Reserve No. 107, including the statutes underlying the Executive Order noted above. BLM's actions and omissions in approving the Mt. Hope Project noted above, including the ROD and FEIS, fail to fully protect the lands withdrawn and protected by Public Water Reserve No. 107, including the statutes underlying the Executive Order noted above. Further, BLM failed to keep the withdrawn lands open for public use under PWR 107 and the SRHA, and failed to obtain congressional authorization for the disposal of federal property in the reserved waters and lands.

164. BLM's actions and omissions in approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

## SECOND CAUSE OF ACTION

### Violation of NEPA

165. The allegations in paragraphs 1-164 are reasserted as if fully stated herein.

166. The BLM's actions and omissions noted above regarding its approval of the Mt. Hope Project, including the ROD, FEIS, ROWs and FGs, violate the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et. seq.* and its implementing regulations.

167.     BLM's actions and omissions in approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

## THIRD CAUSE OF ACTION

### Violation of FLPMA

168.     The allegations in paragraphs 1-163 are reasserted as if fully stated herein.

169.     BLM's actions and omissions noted above regarding its approval of the Project, including the ROD, FEIS, ROWs and FGs, violate FLPMA, 43 U.S.C. § 1701 *et seq*, and its implementing regulations.

170.     BLM's actions and omissions in approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs pray this court:

A.     Enter an order declaring that BLM's decisions reviewing and approving the Mt. Hope Project and related actions, including the ROD, FEIS, ROWs and FGs,

violate NEPA, FLPMA, the 1926 Executive Order and related laws, and the APA,

and their implementing regulations;

B.      Issue an immediate and permanent injunction prohibiting Defendants, their

agents, servants, employees, and all others acting in concert with them, or subject

to their authority or control, from proceeding with the Mt. Hope Project, pending

full compliance with the requirements of federal law;

C.      Issue an order granting Plaintiffs their costs and reasonable attorneys fees

incurred in bringing this action, pursuant to 28 U.S.C. § 2412 et seq. and any

other applicable statutory or equitable principles; and

D.      Issue an order granting such further relief this court deems just and proper.


Respectfully submitted this 15th day of February, 2013.

*/s/ Julie Cavanaugh-Bill*
_____
Julie Cavanaugh-Bill, Nevada Bar # 11533
CAVANAUGH-BILL LAW OFFICES, LLC
401 Railroad St., Ste. 307
Elko, Nevada 89801
(775) 753-4357
julie@cblawoffices.org

Roger Flynn, *Pro Hac Vice Application To Be Filed*
Jeffrey C. Parsons, *Pro Hac Vice Application To Be Filed*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

Attorneys for Plaintiffs