# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

GREAT BASIN RESOURCE WATCH,
WESTERN SHOSHONE DEFENSE
PROJECT,

        Plaintiffs,

        vs.

UNITED STATES DEPARTMENT OF THE
INTERIOR; AMY LUEDERS, BLM State
Director, and CHRISTOPHER J. COOK,
BLM Mt. Lewis Field Manager,

        Defendants,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

3:13-cv-00078-RCJ-VPC

**ORDER**

_____

       This case arises out of Defendants' administrative approval of a proposed molybdenum mine located 23 miles northwest of Eureka, Nevada. Plaintiffs seek to enjoin construction under various environmental laws and now move for summary judgment. (ECF No. 56). For the reasons stated herein, the motion is denied.

## I.    FACTS AND PROCEDURAL HISTORY

       On February 15, 2013, Plaintiffs Great Basin Resource Watch and Western Shoshone Defense Project (collectively "Plaintiffs") filed a complaint against Defendants U.S. Bureau of Land Management ("BLM"); U.S. Department of the Interior; Amy Lueders, BLM State Director; and Christopher J. Cook, BLM Mount Lewis Field Manager (collectively "Defendants"). (Compl., ECF No. 1, at 1). The complaint challenges Defendants' approval of the Mount Hope Project ("Project" or "Mine"), a large open-pit molybdenum mining project on

public lands, proposed by Intervenor Eureka Moly, LLC ("EML").[1] (*Id.* at 2). Specifically, Plaintiffs challenge the Record of Decision ("ROD") approving the Mine and the corresponding Final Environmental Impact Statement ("FEIS") prepared by BLM. (*Id.*). Plaintiffs also challenge BLM State Director Lueders' rejection of their petition for state director review of the ROD and FEIS. (*Id.* at 3).

Plaintiff Great Basin Resource Watch ("GBRW") is a non-profit organization based in Reno, Nevada, concerned with protecting the Great Basin's land, air, water, wildlife, and communities from the adverse impacts of hardrock mining. (*Id.* at 37). GBRW is a coalition of ranchers, sportsmen, conservationists, and Native Americans. (*Id.*). GBRW members include ranchers and farmers who live, work on, and own private lands near the Project. (*Id.*). These members own water rights in the Mount Hope area, where they graze and water livestock. (*Id.*). GBRW submitted comments to BLM regarding the Draft EIS ("DEIS") and filed a petition for review of the Project approval decisions and FEIS with BLM's State Director. This petition was rejected on January 4, 2013. (*Id.* at 38).

Plaintiff Western Shoshone Defense Project ("WSDP") is under the direction of the Western Shoshone National Council, a traditional government of the Western Shoshone people. (*Id.*). Its mission is to protect and preserve Western Shoshone rights and homelands for present and future generations. (*Id.*). WSDP's members use the lands for traditional, cultural, and religious purposes, and its petition for State Director review was likewise denied. (*Id.*).

The Project is located 23 miles northwest of Eureka, Nevada, and it is situated on both private and public lands. (ROD, AR[2] 051837). The Project covers over 22,886 acres and includes

---

[1] On July 11, 2013, the Court granted EML's unopposed motion to intervene. (Order, ECF No. 41).

[2] "AR" refers to the pages of the Administrative Record that Defendants manually submitted on computer disks. (*See* Notice of Submission, ECF No. 50).

the open-pit molybdenum mine; waste rock disposal facilities; milling facilities; a molybdenite concentrate roaster and packaging plant; a ferromolybdenum plant; two tailings storage facilities; exploration roads, pads, and sumps; a low-grade ore stockpile; a water supply system; a 24-mile electric supply line; a number of new roads; and other ancillary facilities. (*Id.* at 051845–051846). The Mine will have an 80-year lifetime, consisting of an 18 to 24 month construction phase, 44 years of mining and processing, 30 years of reclamation, and 5 years of post-closure monitoring. (*Id.* at 051837). EML's holdings include 14 patented claims and approximately 1,550 lode and millsite mining claims, for a total land position of approximately 29,000 acres. (*Id.* at 051842).

EML intends to mine the Mount Hope ore body, which contains an estimated 966 million tons of molybdenite (molybdenum disulfide) ore. (*Id.*). This ore will produce approximately 1.1 billion pounds of recoverable molybdenum. (*Id.*). The proposed mining and processing will also produce approximately 1.7 billion tons of waste rock and 1 billion tons of tailings. (*Id.*). The surface disturbance associated with the proposed activities totals 8,355 acres on both public and private lands. (*Id.*).

To keep the mine pit dry, the Project will require pumping the regional aquifer, i.e., dewatering, during the mining phase. (FEIS, AR 049882).The dewatering will lower, or drawdown, the water table in the area. (*Id.* at 049886). The FEIS predicts that 22 springs, 2 perennial stream segments, and portions of 4 intermittent and ephemeral stream drainages are within the maximum area where at least a ten-foot drop in the water level will occur (the "10-foot drawdown cone"). (*Id*).

Plaintiffs allege that the dewatering will result in significant and irreparable adverse impacts to the springs, seeps, and waterholes, especially those within the 10-foot drawdown

cone. (Compl., ECF No. 1, at 8). They further contend that there are at least four adjudicated Public Water Reserves #107 ("PWR 107") federal reserved water rights within the 10-foot drawdown cone: Mount Hope Spring (No. 619), Garden Spring (No. 597), McBrides Spring (No. 612), and Lone Mountain Spring (No. 742). (*Id.* at 12–15).[3] Unnamed springs 604 and 646 are also within the drawdown cone, but they have not been recognized by BLM or adjudicated by the State Engineer. (*Id.* at 15). However, according to Plaintiffs, these springs and waters are reserved under PWR 107 and are therefore entitled to all associated protections. (*Id.*). Plaintiffs complain that Defendants failed to require these and other mandated protections.

Seeking declaratory and injunctive relief under the Administrative Procedures Act Plaintiffs contend that Defendants' actions and omissions in approving the Project: (1) fail to protect federal water rights and associated withdrawn lands in violation of PWR 107 and related laws; (2) violate the National Environmental Policy Act ("NEPA"); and (3) violate the Federal Land Policy Management Act ("FLPMA"). (Compl., ECF No. 1, at 53–55). To support these claims, Plaintiffs identify eight potential defects in the approval.

First, the ROD approves the construction of Project facilities within one quarter mile of Springs 597, 604, 619, and 646, or, at a minimum, within 40 acres of springs withdrawn by PWR 107. (Compl. ECF No. 1, at 16 (citing FEIS, Figure 2.1.5, AR 049745)). BLM neither precluded EML from locating Project facilities on or adjacent to the PWR 107 springs nor kept these lands open for public use. (*Id.*).

Second, while the mitigation plan for the affected springs consists of installing pipes and other infrastructure to replenish lost water, the plan fails to identify the source of the replacement water, and there is (allegedly) no evidence that the plan will be effective. (*Id.* at 17–20).

Third, the Project is expected to slowly form a pit lake that will reach a depth of 900 feet

---

[3] Plaintiffs now concede that these rights have not been adjudicated. (Reply, ECF No. 62, at 13).

200 years after the end of mining and eventually reach a depth of 1100 feet. (*Id.* at 21 (citing FEIS, AR 049999–50000)). The water quality in the pit lake is predicted to exceed federal and state water quality standards for a number of pollutants. (*Id.* (citing FEIS, AR 049999)). Defendants did not propose a mitigation plan for the pit lake. (*Id.*). Instead, they concluded that "[t]here would be a low potential for impacts to ground water quality due to the formation of a ground water sink in the open pit." (*Id.* (citing FEIS, AR 049999)). The FEIS further explains that because "[a]ccess to the open pit by humans and livestock would be restricted," there is no need to mitigate against, or prevent, the violation of water quality standards in the pit lake. (FEIS, AR 049999).

Fourth, the FEIS acknowledges that the Project will significantly impact portions of the Pony Express National Historic Trail that are eligible for listing on the National Register of Historic Places. (Compl. ECF No. 1, at 24 (citing FEIS, AR 050357–050358)). BLM, however, allowed EML to defer the submission of its plan to mitigate this impact until after the FEIS was completed. (*Id.* (citing FEIS, AR 050373)). Because EML did not develop the approved mitigation plan until after the FEIS was published, neither Plaintiffs nor the public had an opportunity to comment on its effectiveness. (*Id.* (citing ROD, AR 051857)). Plaintiffs imply that the mitigation plan, which consists largely of photo-documenting portions of the trail that will be impacted, is inadequate. (*Id.* at 25 (citing ROD, AR 051857)).

Fifth, while BLM required financial guarantees related to the reclamation process, it allegedly failed to adequately review the proposed guarantees under NEPA, and neither Plaintiffs nor the public were allowed to see or comment on the proposed guarantees during the NEPA process. (*Id.*).

Sixth, the ROD approves EML's plan to "toll roast," which means that EML is

authorized to receive and process concentrates/ore from other molybdenum mines in the region. (*Id.* at 30 (citing ROD, AR 051846)). "However, the FEIS contains no analysis of the sources of this ore (i.e., the 'other mines'), the impacts from these operations, or the full extent of the transportation and other impacts from this approval." (*Id.*). According to Plaintiffs, NEPA requires a detailed analysis of each of these issues. (*Id.*).

Seventh, BLM did not obtain any data regarding existing, or baseline, pollution levels at or near the Project site. (*Id.* (citing FEIS, Table 3.6-7, AR 050072)). Instead, for some pollutants, it used data from Great Basin National Park, a protected environment over 100 miles away. (*Id.*). For another pollutant, it used data from Boulder City, Nevada, which is over 200 miles away. (*Id.* at 32). Finally, for the other regulated criteria pollutants, BLM assumed an existing level of zero, based on a recommendation from the Nevada Bureau of Air Pollution Control—the agency responsible for air quality permitting in Nevada. (*See id.* (citing FEIS, Table 3.6-7, AR 050072)). BLM relied on these baseline figures when it concluded that the Project's air-quality impact would not exceed the applicable standards. (*Id.* (citing FEIS, Table 3.6-9, AR 050076)). Plaintiffs contend that "without adequate baseline data, this conclusion is unsupportable." (*Id.*).

Eighth, the FEIS acknowledges that there will be cumulative effects/impacts from various mining, oil and gas, agricultural, commercial, and other activities. (*Id.* at 35 (citing FEIS, AR 050468-050561)). According to Plaintiffs, however, BLM failed to analyze these cumulative impacts with the scrutiny and detail demanded by NEPA. (*Id.*).

Plaintiffs now move for summary judgment, seeking an order vacating and remanding BLM's approval of the Mount Hope Mine Project. (Mot. Summ. J., ECF No. 56, at 38). Defendants and EML have each filed an opposition, (Defs.' Opp'n, ECF No. 61; EML's Opp'n, ECF No. 60), and Plaintiffs have filed a consolidated reply. (ECF No. 62) The Court now

considers, and ultimately denies, the pending motion.

## II.   LEGAL STANDARD

The Administrative Procedures Act ("APA") governs judicial review of agency actions that allegedly violate NEPA or FLPMA. *Oregon Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1124 (9th Cir. 2007). Under the APA, "an agency action may be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)).

This standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (citations omitted). A reviewing court may not consider information outside of the administrative record, *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir.1988), and "may not substitute its judgment for that of the agency," *W. Radio Servs. Co., Inc. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996) (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376 (1989)). Instead, the court "must determine whether the agency's decision was made after considering the relevant factors and whether the agency made a clear error of judgment." *Id.* Courts "may reverse the agency's decision as arbitrary or capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

In deciding whether to grant summary judgment in a challenge to administrative proceedings, a district court "is not required to resolve any facts." *Occidental Eng'g Co. v. I.N.S.*,

753 F.2d 766, 769 (9th Cir.1985). Instead, the court's function is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.*

## III.   ANALYSIS

Plaintiffs contend that they are entitled to summary judgment with respect to all three of their claims. Specifically, they argue that Defendants: (1) failed to protect federally reserved water rights and lands; (2) failed to comply with NEPA's procedural mandates; and (3) failed to prevent undue environmental degradation in violation of FLPMA. These arguments lack merit.

### A.   Claim 1: Public Water Reserves No. 107

Plaintiffs first argue that Defendants failed to protect federal water rights and surrounding withdrawn lands in violation of PWR 107. (Mot. Summ. J., ECF No. 56, at 16). The Court disagrees, concluding (1) that the springs at issue do not qualify as PWR 107 water sources and that, in any case, Defendants have not failed to protect them; and (2) that even if the surrounding lands were withdrawn by PWR 107, they are subject to the Pickett Act's mining exception.

### i.   Federal Water Rights Under PWR 107

On April 17, 1926, President Calvin Coolidge created PWR 107 by executive order. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 966 (9th Cir. 2006). The order provided in full:

> Under and pursuant to the provisions of the act of Congress approved June 25, 1910 (36 Stat., 847), entitled 'An act to authorize the President of the United States to make withdrawals of public lands in certain cases', as amended by act of Congress approved August 24, 1912 (37 Stat., 497), it is hereby ordered that every smallest legal subdivision of the public land surveys which is vacant unappropriated unreserved public land and contains a spring or water hole, and all land within one quarter of a mile of every spring or water hole located on unsurveyed public land be, and the same is hereby, withdrawn from settlement, location, sale, or entry, and reserved for public use in accordance with the

provisions of Sec. 10 of the act of December 29, 1916 (39 Stat., 862), and in aid of pending legislation.

(PWR 107, ECF No. 25-1, at 1).

Section 10 of the Stock Raising Homestead Act of 1916 ("SRHA") referenced in PWR 107 further provides:

> That lands containing holes or other bodies of water needed or used by the public for watering purposes shall not be designated under this Act but may be reserved under the provisions of the Act of [June 25, 1910], and such lands heretofore or hereafter reserved shall, while so reserved, be kept and held open to the public use for such purposes under such general rules and regulations as the Secretary of the Interior may prescribe: *Provided*, That the Secretary may, in his discretion, also withdraw from entry lands necessary to insure access by the public to watering places reserved hereunder and needed for use in the movement of stock to summer and winter ranges or to shipping points, and may prescribe such rules and regulations as may be necessary for the proper administration and use of such lands . . . .

Act of Dec. 29, 1916, Ch. 9, Sec. 10, 39 Stat. 862, 865. An Interior Department instructional memorandum issued weeks after the order was signed states that PWR 107 does not apply to lands having "small springs or water holes affording only enough water for the use of one family and its domestic animals." Interior Dept. Circular 1066, 51 L.D. 457 (May 25, 1926); James Muhn, *Public Water Reserves: The Metamorphosis of a Public Land Policy*, 21 J. Land Resources & Envtl. L. 67, 111 (2001). Additionally, the Interior Department stated, "that the withdrawal is not intended to affect springs and water-holes which are manifestly not used or needed presently or in the future for public watering purposes." Muhn, 118 (quoting Letter from General Land Office Commissioner Spry, dated October 13, 1926). Most recently, the Interior Department Solicitor opined that PWR 107 applies to "*important* springs and water holes which provide the water supply for tracts of public domain land *larger than . . . 640 acres*." 90 Interior Dec. 81 (D.O.I.), 83, 1983 WL 187400, at *3 (emphasis added). Relying on this opinion, another court in this district has held that "BLM is not required to afford absolute protection to all seeps

and springs located on federal land. Instead, PWR 107 applies only to those water sources that are 'important' and have sufficient flow for consumption." *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 643 F. Supp. 2d 1192, 1211 (D. Nev. 2009) (Hicks, J.), *rev'd on other grounds*, 588 F.3d 718 (9th Cir. 2009); *see also United States v. City & Cnty. of Denver*, 656 P.2d 1, 31 n.48 (Colo. 1982). The SRHA's legislative history supports this conclusion:

> This is a new section and authorizes the Secretary of the Interior to withdraw from entry and hold open for the general use of the public, *important* water holes, springs, and other bodies of water that are necessary for large surrounding tracts of country, so that *a person cannot monopolize or control a large territory by locating as a homestead the only available water supply for stock in that vicinity.*

H.R. Rep. No. 35, 64th Cong., 1st Sess. 18 (1916) (emphasis added).

In the instant case, Plaintiffs now concede that the Project will not affect any adjudicated PWR 107 rights. (Reply, ECF No. 62, at 13). Instead, based only on notices of potential PWR 107 claims, Plaintiffs now contend that "[t]here are at least four recognized and important PWR 107 Federal Reserved Water Rights within the 10-foot drawdown cone." (Mot. Summ. J., ECF No. 56, at 19). This argument is premised entirely on four "notifications" of PWR 107 claims that BLM filed with the Nevada State Engineer in 1994. (*Id.* at 19–20). Plaintiffs offer no other evidence in support of their PWR 107 theory. BLM does not deny that it filed these notifications. (Opp'n Mot. Summ. J., ECF No. 61, at 11). Instead, it asserts that the evidence and analysis collected during the EIS process reveals that the four "noticed" springs do not, in fact, qualify for PWR 107 status. (*Id.*). The Court agrees with BLM's assessment.

The record demonstrates that the referenced springs, Garden (No. 597), McBrides (No. 612), Mt. Hope (No. 619), and Lone Mountain (No. 742), and the two unnamed springs (Nos. 604 and 646), are either man-made or lack sufficient flow to qualify for reservation under PWR 107. (*See* FEIS, Table 3.2-9, AR 049895–049908). As explained in the FEIS, these springs not only provide inadequate water for domestic purposes, they also lack a visible water flow and

support very little or no vegetation. (*Id.*). Specifically, Garden Spring (No. 597) flows at less than 0.1 gpm and supports less than 0.020 acres of riparian vegetation, (FEIS, Table 3.2-8, AR 049885; Table 3.2-9, 049897); McBrides Spring (No. 612), flows at 1.8 gpm, supports little or no riparian vegetation, and is dry to a depth of 18 inches below the ground, (*id.* at AR 049885, 049901, 049847); Mt. Hope Spring (No. 619), flows at 0.03 gpm and supports no riparian vegetation, (*id.* at AR 049885, 049902); Lone Mountain Spring (No. 742) has no observable flow and supports no riparian vegetation, (*id.* at AR 049906); Unnamed Spring (No. 604) is a man-made pond that flows at less than .01 gpm and supports less than one-tenth of an acre of riparian vegetation, (*id.* at AR 049885, 049899); and Unnamed Spring (No. 646) has no observable flow and supports very little riparian vegetation, (*id.* at AR 049886, 049905). In short, nothing in the record requires the Court to conclude that the springs described in the complaint are "important" such that they qualify for PWR 107 status. Therefore, BLM's decision to deny such status, (FEIS, AR 049869, 049871, 049885 ("There are no PWRs within the ten-foot drawdown")), was not unreasonable.

More importantly, even assuming that any or all of the cited springs qualify for PWR 107 protection, the Court cannot conclude that BLM failed to require adequate protection. To illustrate, Garden Spring is generally used as a water supply for wildlife, livestock, and wild horses. (FEIS, Table 3.2-9, 049897). The FEIS acknowledges that the Project will cause a reduction of flow coincident with a reduction in ground water levels in the area. (*Id.*). As a contingency mitigation measure, EML will pipe water along an existing and new road approximately 1.5 miles long from a pipeline to Unnamed Spring No. 583 at a sustained rate of approximately 0.5 gpm. (*Id.*). The FEIS states that this will be "highly effective at maintaining

habitat diversity and would provide a perennial water supply for livestock, wildlife, and wild horse uses," (*id.*), and the Court has no reason to disagree.

The FEIS includes a similar, but uniquely tailored, "highly effective" contingency mitigation plan for each of the springs at issue. (*See id.* at 049895–049908). With these plans in place, the Project will simply relocate, rather than eliminate, the disputed water supplies. Accordingly, the Court finds that BLM identified the impact at issue and mandated mitigation adequate to reserve the minimum amount of water necessary for animal consumption. Therefore, even if the springs at issue qualify for PWR 107 status, BLM has required adequate protection.

### ii.   Lands Withdrawn Under PWR 107

Relying on the erroneous premise that PWR 107 is applicable, Plaintiffs further argue that BLM unlawfully allowed EML to mine "the lands withdrawn under [PWR 107]." (Mot. Summ. J., ECF No. 56, at 21). As an initial matter, Plaintiffs concede that the Pickett Act, which authorized PWR 107, required that all PWR 107 withdrawn lands remain open to the mining of metalliferous minerals such as molybdenum. (*Id.* at 22–23). They contend, however, that because the Pickett Act was repealed by FLPMA in 1976, before EML acquired its mining claims, the Pickett Act's mining exception is inapplicable here. (*Id.*). They also contend that even if the "withdrawn" lands are subject to the mining exception, BLM unlawfully failed to determine that EML's mining claims were supported by a discovery of a valuable mineral deposit. (*Id.* at 23). The Court rejects both of these arguments, concluding that even if the disputed lands were withdrawn under PWR 107, the Picket Act's mining exception would apply, and that under these circumstances, BLM had no enforceable duty to determine the validity of the mining claim prior to approving the Project.

The Pickett Act of 1910 gave the President of the United States the authority "at any time in his discretion, [to] temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States . . . and reserve the same . . . ." Act of June 25, 1910, ch. 421, § 1, 36 Stat. 847; *see also S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 147 F. Supp. 2d 1130, 1144 (D. Utah 2001). Exercising this authority, President Coolidge executed PWR 107. Withdrawals under the Pickett Act, however, were subject to certain qualifications, including section 2's mining exception, which provided that "all lands withdrawn under the provisions of this Act shall at all times be open to exploration, discovery, occupation, and purchase, under the mining laws of the United States, so far as the same apply to minerals other than coal, oil, gas, and phosphates." *S. Utah Wilderness Alliance*, 147 F. Supp. 2d at 1144 (quoting Act of June 25, 1010, ch. 421, § 2, 36 Stat. 847). In 1912, Congress amended section 2 to substitute "metalliferous minerals" for "minerals other than coal, oil, gas, and phosphates." Act of Aug. 24, 1912, ch. 369 § 2, 37 Stat. 497; *see United States v. Kent Bush*, 157 IBLA 359, 360 n.1 (Oct. 31, 2002).

Section 704(a) of the FLPMA of 1976 repealed section 2 of the Pickett Act, as amended in 1912. *David E. Hoover & Lester F. Whalley*, 99 IBLA 291, 293 (Oct. 26, 1987). The repeal, however, was subject to a savings provision, which preserved withdrawals, including PWR 107, predating Oct. 21, 1976. *Kent Bush*, 157 IBLA at 360 n.1 (citing FLPMA, 90 Stat. 2743 (1976)); *David E. Hoover*, 99 IBLA at 293 ("The repeal of the Pickett Act did not affect withdrawals made under its authority"). Indeed, "it has long been recognized as a matter of law that withdrawals made under the Pickett Act remain in effect until revoked." *David E. Hoover*, 99 IBLA at 293.[4] Consistent with these authorities, the Court concludes that the lands withdrawn under the 1926 executive order, along with any qualifications imposed by the Pickett Act, were

---

[4] Plaintiffs expressly concede this point. (Mot. Summ. J., ECF No. 22).

preserved by the FLPMA. Therefore, the Pickett Act's mining exception remains operative in this case. Plaintiffs' contrary position is simply untenable: Without any statutory support, it assumes that the FLPMA's repeal of the Pickett Act not only preserved PWR 107 withdrawals, but that it also somehow further withdrew PWR 107 lands from mining for metalliferous minerals. Faced with well-reasoned contrary authority, *see, e.g.*, *Kent Bush*, 157 IBLA at 360 (concluding that withdrawn lands remain open for entry for metalliferous minerals), the Court disagrees. The lands at issue in this case were never withdrawn from mining for metalliferous minerals. Accordingly, the Court cannot conclude that the Project fails to protect lands withdrawn pursuant to PWR 107.

The Court further concludes that because the lands at issue are open to entry under the Mining Law, BLM is not required to determine mining claim or mill site validity before approving a mine plan. On November 14, 2005, the U.S. Department of Interior Office of the Solicitor issued an opinion stating that "no law requires that the Secretary determine mining claim or mill site validity before approving a plan of operations on lands open to entry under the Mining Law (hereinafter 'open lands')." Solicitor's Op., M-37012, at 3 (Nov. 14, 2005) (citing *W. Shoshone Def. Project*, 160 IBLA 32, 57 (2003) ("[W]hile BLM always possesses the authority to investigate the validity of unpatented mining claims, it is not required to do so, nor should it suspend consideration of a plan of operations even when it decides to conduct a validity examination of the affected claims to determine whether to initiate a contest.")), *available at* http://www.doi.gov/solicitor/opinions/M-37012.pdf.[5] In contrast, when lands are withdrawn from entry under the Mining Law, "the Department must verify whether the claimant has located a

---

[5] Solicitor's opinions are binding on the Interior Board of Land Appeals ("IBLA"). *McMaster v. United States*, 731 F.3d 881, 892 n.4 (9th Cir. 2013).

valid mining claim, including whether the claimant has discovered a valuable mineral deposit as of the withdrawal date, before approving a plan of operations because only claims perfected before the withdrawal establish a valid existing property interest." (*Id.* at 4). In February 2012, the IBLA relied on the Solicitor's opinion and again concluded that BLM has discretion to investigate the validity of unpatented mining claims on open lands. *Great Basin Res. Watch & W. Shoshone Defense Project*, 182 IBLA 55, 67–68 (Feb. 7, 2012). Finding no contrary law, the Court follows these persuasive authorities. Because the land at issue was not withdrawn from entry under the Mining Law, BLM was not required to assess the validity of EML's mining claim before approving the Project. Therefore, with respect to the claims under PWR 107, Plaintiffs' motion for summary judgment fails.

**B.    Claim 2: National Environmental Policy Act**

In an attempt to establish a NEPA violation, Plaintiffs contend that the FEIS is deficient for three independent reasons. Specifically, Plaintiffs argue that the FEIS: (1) fails to fully analyze the Project's baseline ambient air conditions; (2) fails to fully analyze the Project's direct, indirect, and cumulative impacts; and (3) lacks adequate mitigation analysis. (Mot. Summ. J., ECF No. 56, at 26–37). The Court finds these arguments unpersuasive.

**i.    NEPA Standard of Review**

NEPA requires federal agencies to consider the consequences of their actions on the environment. NEPA's mandate to federal agencies is "essentially procedural . . . . It is to insure a fully informed and well-considered decision . . . ." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978) (internal citations omitted). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Under NEPA, an EIS is required for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 640 (9th Cir. 2014). "A properly prepared EIS ensures that federal agencies have sufficiently detailed information to decide whether to proceed with an action in light of potential environmental consequences, and it provides the public with information on the environmental impact of a proposed action and encourages public participation in the development of that information." *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987).

"In assessing the adequacy of an EIS, [the court] employ[s] a 'rule of reason' test to determine whether the EIS contains a 'reasonably thorough discussion of the significant aspects of probable environmental consequences.'" *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998)). "Under this standard, [the court's] task is to ensure that the [agency] took a 'hard look' at these consequences." *Id.* "The reviewing court may not 'flyspeck' an EIS . . . or 'substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action.'" *Half Moon Bay Fishermans' Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988) (internal citations omitted) (quoting *Nw. Indian Cemetery Protective Ass'n v. Peterson*, 795 F.2d 688, 695 (9th Cir. 1986)); *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)). Instead, "the environmental impact statement review standard is limited and decidedly deferential to the agency's expertise." *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994) (citing *NRDC. v. Hodel*, 819 F.2d 927, 929 (9th Cir.1987)). Thus, "If the agency has taken a 'hard look' at a decision's environmental consequences, the decision must

not be disturbed." *Half Moon Bay*, 857 F.2d at 508 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

### ii.   Air Emissions Analysis

Plaintiffs are dissatisfied with BLM's approach to accounting for background pollution levels in the air quality modeling. (Mot. Summ. J., ECF No. 56, at 26). According to Plaintiffs, BLM's decision to adopt the recommendation and technical expertise of the Nevada Division of Environmental Protection's ("NDEP") Bureau of Air Pollution Control ("BAPC"), the agency responsible for air quality permitting in Nevada, (FEIS, AR 050060, 050072), instead of collecting new data from the Project site, was "arbitrary and capricious" and "fatally flaws the FEIS." (Reply, ECF No. 62, at 27, 30). This argument is without merit. A selection of background values for an air quality model is exactly the type of technical decision that demands a reviewing court's deference. Indeed, "[d]eference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matter." *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989).

The FEIS devotes an entire chapter to discussion and analysis of background conditions and potential air quality impacts. (*See* FEIS, ch. 3.6, AR 050057–050098). This analysis fully complies with NEPA. With respect to background pollution levels, the FEIS provides the following:

> To assess the impact of the Project on the ambient air quality, it was necessary to account for existing, or background, levels for each pollutant. No monitoring has been performed within the Project Area for ambient concentrations of $CO$, $NO_2$, $O_3$, or $SO_2$, nor does the BAPC specify background concentrations for these pollutants. However, background values are necessary for the purpose of comparing modeled results to the NAAQS[6] and NSAAQS[7]. *The BAPC was contacted to obtain representative background concentrations for the modeling analysis. The BAPC recommended background concentrations are presented in*

---

[6] National Ambient Air Quality Standards.
[7] Nevada State Ambient Air Quality Standards.

*Table 3.6-7.*[8]

. . . The $PM_{10}$ background concentrations are the default Nevada values recommended by the BAPC for unmonitored rural areas like the Project Area. For the $PM_{2.5}$ background, monitoring aerosol data from Great Basin National Park were used. *The BAPC recommends assuming zero background for CO, $NO_2$, and $SO_2$ for unmonitored rural areas similar to the Project Area . . .*

(FEIS, AR 050072 (emphasis added)).

In the comment section, BLM adequately addressed concerns over its reliance on these background concentrations. To illustrate, a commenter was concerned that: (1) the DEIS did not adequately discuss baseline air pollution values; (2) the EIS's air quality section failed to establish baseline air pollution values derived from monitoring within the affected area; and (3) the EIS instead utilized data from several other locations around Nevada to establish a baseline for assessing the Project's impact. (FEIS, Draft EIS Public Comments and Responses, App. H, AR 051276). Explaining its deference to BAPC's

---

[8] Table 3.6-7 provides:

| Pollutant | Averaging Period | Monitor Location | Year | Background Concentration ($\mu g/m^3$) | Reference |
|---|---|---|---|---|---|
| $PM_{10}$ | 24-Hour | NV Rural Area Default, Great Basin NP | N/A | 10.2 | BAPC |
| | Annual | NV Rural Area Default | N/A | 9.0 | BAPC |
| $PM_{2.5}$ | 24-Hour[3] | Great Basin NP | 2005-2007 | 7.0 | BAPC [1] |
| | Annual[4] | Great Basin NP | 2005-2007 | 2.4 | BAPC |
| CO | 1-Hour | N/A | N/A | 0 | BAPC [2] |
| | 8-Hour | N/A | N/A | 0 | BAPC [2] |
| $NO_2$ | 1-Hour | N/A | N/A | 0 | BAPC [2] |
| | Annual | N/A | N/A | 0 | BAPC [2] |
| $SO_2$ | 1-Hour | N/A | N/A | 0 | BAPC [2] |
| | 3-Hour | N/A | N/A | 0 | BAPC [2] |
| | 24-Hour | Boulder City, Clark Co., NV | 2001-2003 | 13.1 | EPA Air Data* |
| | Annual | Boulder City, Clark Co., NV | 2001-2003 | 2.6 | EPA Air Data* |
| Pb | Quarterly | N/A | N/A | 0 | BAPC |

recommendation, BLM responded:

> The BLM used the best available data in the DEIS. Typically, a PSD [Prevention of Significant Deterioration] source is required to conduct onsite baseline air quality monitoring, at a regulatory agency's discretion. The proposed Mount Hope facility would not be a PSD source (it would not even be a Title V source), and therefore, it is not subject to regulatory requirements of onsite baseline air quality monitoring. The Mount Hope facility falls under the jurisdiction of the NDEP for air permitting, and BLM directed EML to follow NDEP's guidance in selecting the background concentrations for the air quality analysis. The revised modeling does not use the pollutant concentrations from Boulder City or Jean. However, $O_3$ concentrations from Great Basin National Park are used as an input for the PVMRM option for $NO_2$ modeling. The particulate matter background concentrations are NDEP-approved values to be used in rural unmonitored locations like the Mount Hope site.

(*Id.*).

Contrary to Plaintiffs' suggestion, the lack of site-specific monitoring data is not an inherent NEPA violation. As BLM explained, sites lacking the potential to emit the primary regulated pollutants in excess of the statutory thresholds are "not subject to PSD regulations or title V[9] application requirements." (FEIS, AR 050065); *see also Util. Air Reg. Grp. v. EPA*, No. 12-1146, 2014 WL 2807314, at *3–4, 573 U.S. ___ (June 23, 2014). Accordingly, BLM obtained representative background concentrations for each pollutant from BAPC and used those concentrations for its modeling analysis. (FEIS, AR 050072.). Plaintiffs are dissatisfied with this decision, but they identify no legal error. Therefore, the Court concludes that BLM reasonably relied on the expertise of the agency in charge of primary CAA permitting and enforcement in the state of Nevada.

After reviewing chapter 3.6 of the FEIS, (AR 050057–050098), the Court finds that BLM took a hard look at the Project through the lens of the applicable air quality laws. In the comments section, BLM addressed Plaintiffs' concerns about baseline air

---

[9] This refers to Title V of the Clean Air Act.

pollution values and explained that it used the best available data to reach its decision. Accordingly, the Court likewise concludes that BLM fostered informed decision making and public participation. Plaintiffs offer nothing substantive to refute BLM's technical findings or methodology. Instead, citing no applicable legal authority, they invite this Court to second-guess BLM's reliance on BAPC's expertise. The Court is without reason to do so. Therefore, BLM's analysis of the air quality consequences will not be disturbed. *See Half Moon Bay*, 857 F.2d at 508.

### iii.    Cumulative Impacts Analysis

Plaintiffs next argue that BLM failed to adequately analyze the Project's cumulative impacts. (Mot. Summ. J., ECF No. 56, at 29–32). Specifically, they contend that the FEIS lacks a "quantified assessment" of data from "various other mining, oil and gas, agricultural, commercial, and other activities," including the Project's plan to "toll roast" ores and concentrates from other mines in the region. (*Id.* at 30–31 ). A careful review of the FEIS, however, belies this argument.

"NEPA requires that where several actions have a cumulative . . . environmental effect, this consequence must be considered in an EIS." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010). A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

"A cumulative impact analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1076 (9th Cir. 2011) (internal citations and quotation marks omitted). To be useful to decision makers and the public, the cumulative impact analysis must include some quantified or detailed information. *Id.* "[G]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id.* "Federal agencies may aggregate cumulative effects analysis for NEPA purposes." *Id.*

As an initial matter, the Court rejects Plaintiffs' claim that the FEIS contains no more than a three-page list of the activities that may cumulatively affect various resources. (Mot. Summ. J., ECF No. 56, at 30–31 (citing FEIS, Table 4.2-2, AR 050475–050477)). This is simply wrong. While the FEIS does include such a summary, (*see* FEIS, Table 4.2-2, AR 050475–050477), it also dedicates over 100 pages to a comprehensive analysis of the activities and impacts summarized, (*see* FEIS, ch. 4, Cumulative Impacts and Irreversible/ Irretrievable Commitment of Resources, AR 050468–050561). Here, the FEIS analyzes cumulative impacts in a three-step approach that includes: (1) identifying, describing, and mapping the cumulative effects study areas ("CESAs") for each resource; (2) cataloging all "past, present, and reasonably foreseeable future actions," including mining, agricultural, oil and gas, land management and development activities; and (3) identifying and quantifying impacts. (*See id.* at 050468 (explaining organization)).

Fatal to Plaintiffs' specific arguments, the FEIS qualitatively and quantitatively evaluates the potential cumulative impacts from grazing, crop irrigation, cattle operations, and personal and commercial land use (among several other activities), (*see* FEIS, § 4.3, Past, Present, and

Reasonably Foreseeable Future Actions, AR 050475–050507), on a multitude of resources, including, for example, water, mineral, agricultural, historic, wildlife, and cultural resources, (*see* FEIS, § 4.4, Evaluation of Potential Proposed Action Cumulative Impacts, AR 050507–050531). Furthermore, BLM modeled air emissions[10] and found that the Project would have no significant cumulative impact on air resources. (*Id.* at 050512–050513; NEPA Air Quality Impact Analysis, Mount Hope Project, Mar. 2012, AR 037430–037572; NEPA Air Quality Impact Analysis, Addendum, Mar. 2012, AR 037392–037429). BLM compared these results to a similar model prepared for the nearby Ruby Hill Mine, which also showed no significant cumulative impacts. (FEIS, AR 050512–050513).

With respect to toll roasting, the FEIS: (1) analyzes potential impacts resulting from the transportation and roasting of toll ores, (*see, e.g.*, *id.* at 049761, 049764, 049782, 050449–050451); (2) assumes a related increase in emissions in the air quality models, (*see id.* at 050066–050087); and (3) considers cumulative air impacts, such as those from agricultural operations, transportation, other processing facilities, and wildfires, (*see id.* at 050512–050513). Plaintiffs take issue with BLM's failure to identify the potential sources of the off-site ore. (*See* Mot. Summ. J., ECF No. 56, at 31). BLM addressed this concern in a response to a commenter:

> The identification of the potential sources of these off-site (toll) ores is not possible and cannot be quantified. NEPA does not require the EIS to speculate on potential sources of ore concentrate. Any processing of these ores through the roaster would have to be done based on the current permit limits in the Project Air Quality Operating Permit which has been issued by the NDEP. Section 3.6 of the EIS discloses the potential air quality impacts associated with the current Project design and Air Quality Operating Permit.

(FEIS, Draft EIS Public Comments and Responses, App. H, AR 051227). Plaintiffs note this agency response but argue, without any legal authority, that BLM is "required under NEPA" to analyze all aspects of toll roasting, including speculative source impacts. (Mot. Summ. J., ECF

---

[10] Modeling is, by definition, a quantitative assessment of potential impacts.

No. 56, at 31–32). The Court is aware of no law or other rule imposing such a requirement. As the remainder of the FEIS demonstrates, BLM conducted its analysis by assuming the maximum number of trucks for ore transportation.[11] Accordingly, regardless of where these trucks may originate, BLM has considered their maximum environmental impact. Therefore, BLM's decision not to speculate as to potential ore sources does not undermine its otherwise thorough cumulative impact analysis, and Plaintiffs' cumulative impact argument is without merit.

iv.   **Mitigation Analysis**

Plaintiffs also contend that the FEIS lacks adequate mitigation analysis. Specifically, Plaintiffs argue that: (1) despite admitting that the Project will impact cultural/ historic sites eligible for listing on the National Register of Historic Places, including the Pony Express National Historic Trail, BLM improperly allowed EML to defer submission of a related mitigation plan until after the completion of the EIS process and, in doing so, deprived the public of an opportunity to comment on the proposed mitigation, (Mot. Summ. J., ECF No. 56, at 32–33); (2) EML's financial guarantees were not adequately considered in the FEIS, and they were not disclosed for public comment, (*id.* at 33–34 ); (3) BLM failed to adequately analyze the mitigation plan for affected surface waters, (*id.* 34–35); and (4) BLM failed to establish a mitigation plan for the pit lake, (*id.* 37–39). These arguments are unpersuasive.

---

[11] The FEIS explains that "EML proposes to toll roast . . . [molybdenum] concentrates produced by other mines to productively utilize the full capacity of the roaster at a rate of approximately seven 22-ton capacity highway trucks per day." (*Id.* at 049761). "Concentrate from offsite may be used and toll roasted to supplement the on-site concentrate to allow the roaster to operate on a more consistent basis at the designed and permitted capacity." (*Id.* at 049764). "The delivery of the offsite concentrate would be up to seven 22-ton capacity highway trucks per day. The transportation off-site of the roasted concentrate would require up to nine 22-ton capacity trucks every two days." (*Id.*). The FEIS estimates that total "truck traffic would result in approximately 26 daily truck trips, including toll roasting." (*Id.* at 049782). According to the FEIS, these 26 daily truck trips would increase the truck traffic on State Route 278 by an estimated 13 percent. (*Id.* at 050450).

An EIS is not complete unless it contains "a reasonably complete discussion of possible mitigation measures." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989). This requirement is implicit in NEPA's demand that the agency prepare a detailed statement on "'any adverse environmental effects which cannot be avoided should the proposal be implemented.'" *Id*. at 351 (quoting NEPA, 42 U.S.C. § 4332(C)(ii)). NEPA does not, however, contain "a substantive requirement that a complete mitigation plan be actually formulated and adopted." *Id*. at 352. Indeed, such a requirement "would be inconsistent with NEPA's reliance on procedural mechanisms." *Id*. at 353.

A mitigation plan "need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements." *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000). Instead, the court "need only be satisfied that the agency took the requisite 'hard look' at the possible mitigating measures." *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000). However, a "perfunctory description" or a "mere listing of mitigating measures, without supporting analytical data," is inadequate. *Id.*

### 1.    Historical and Cultural Sites

Plaintiffs' argument concerning the Pony Express Trail lacks merit. Chapter 3 of the FEIS discusses the impact to the historic trails in the Project Area and explicitly evaluates mitigation measures. (*See* FEIS, AR 050357–0503660). To illustrate, the FEIS states that mitigation "for the historic trail would include photodocumentation to capture the setting and feel of the Pony Express Trail adjacent to the Project that would be visually impacted." (*Id.* at 050361). The treatment plan will also include "off-site mitigation in the form of GPS mapping and surveying of off-site portions of the Pony Express Trail located on public land." (*Id.*). While

the FEIS notes that the plan will not reduce the physical impact, it explains that the mitigation was designed to document the user experience on the impacted segments of the trail. (*Id.*). Furthermore, EML will provide access to the closed trail segments during the annual Pony Express re-ride and, subject to a 30-day advance notice requirement and certain safety restrictions, during other times of the year. (*Id.* at 050361–050362).

With respect to the protection of cultural sites, the National Historic Preservation Act ("NHPA") requires that, prior to any federal undertaking, the relevant federal agency "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f. Section 106 of NHPA is a "stop, look, and listen provision that requires each federal agency to consider the effects of its programs." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (internal quotation marks omitted). Under NHPA:

> a federal agency must make a reasonable and good faith effort to identify historic properties, 36 C.F.R. § 800.4(b); determine whether identified properties are eligible for listing on the National Register based on criteria in 36 C.F.R. § 60.4; assess the effects of the undertaking on any eligible historic properties found, 36 C.F.R. §§ 800.4(c), 800.5, 800.9(a); determine whether the effect will be adverse, 36 C.F.R. §§ 800.5(c), 800.9(b); and avoid or mitigate any adverse effects, 36 C.F.R. §§ 800.8(e), 800.9(c). The [agency] must confer with the State Historic Preservation Officer ("SHPO") . . . .

*Id.*

In this case, the SHPO accepted EML's treatment plan on October 25, 2012. (ROD, AR 051857). The Programmatic Agreement ("PA") between SHPO, BLM, and EML addressed potential adverse effects to eligible or unevaluated cultural sites and specified the measures to be taken with regard to: (1) the identification and evaluation of historic properties; (2) Native American consultation; (3) resolutions of eligibility; (4) development of treatment plans; (5) discovery situations; (6) reporting and monitoring; (7) notices to proceed; (8) time frames for

inventory, consultation, report completion, and curation; (9) surety bonds; (10) dispute

resolution; and (11) executing, amending, and terminating the PA. (FEIS, AR 050368). The PA

was made available for public review. (*Id.*). Moreover, the FEIS describes potential cultural sites

and related mitigation plans. (*See id.* at 050368–05030379). Finally, to the extent Plaintiffs

complain that they were not permitted to review and comment on the treatment plan for certain

identified historical and cultural sites, the Court notes that federal law prohibits BLM from

publicizing "information concerning the nature and location of any archaeological resource"

subject to exceptions not applicable here. *See* 43 C.F.R. § 7.18(a). At bottom, Plaintiffs fail to

establish any legal error with respect to BLM's through NHPA analysis, and their argument

concerning historical and cultural sites is therefore unavailing.

**2.    Financial Guarantees**

43 C.F.R. § 3809.552(a) requires EML to guarantee payment of reclamation- and

compliance-related costs. The guarantee "must cover the estimated cost as if [BLM] were to

contract with a third party to reclaim [EML's] operations according to the reclamation plan,

including construction and maintenance costs for any treatment facilities necessary to meet

Federal and State environmental standards." *Id.* "The financial guarantee must also cover any

interim stabilization and infrastructure maintenance costs needed to maintain the area of

operations in compliance with applicable environmental requirements while third-party contracts

are developed and executed." *Id*. BLM's section 3809 handbook specifically states that "BLM's

review and approval of a financial guarantee is part of its compliance enforcement program to

ensure that an operator fulfills its reclamation responsibility" and that "[a]ny decision concerning

the need, amount, acceptability, and/or forfeiture of a financial guarantee is also part of the

BLM's compliance and enforcement program." BLM Manual 3809, § 2.5 (Release 3-335, Sept.

7, 2012), *available at*

http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/bl

m_manual.Par.32340.File.dat/3809%20Manual%20final%209%207%2012.pdf (last visited July

8, 2014). Most importantly, however, the handbook explicitly provides that "[t]hese decisions *do*

*not require an environmental review under NEPA and are not to be included in NEPA*

*documents used to review a proposed operation.*" *Id.* (emphasis added); *see also Ctr. for*

*Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013) (Reclamation cost estimates

and acceptance of an operator's proposed bond amount are "the type of monitoring and

compliance activities that this court has determined do not trigger NEPA's requirements.").

Again, Plaintiffs cite no contrary authority, and the Court is aware of none. The Court therefore

rejects Plaintiffs' argument concerning BLM's analysis of EML's financial guarantee.

### 3.   Surface and Ground Waters

Recycling their earlier surface and ground water arguments, Plaintiffs contend that the

FEIS fails to adequately analyze mitigation plans for affected springs and streams. (Mot. Summ.

J., ECF No. 56, at 34–35). The Court rejects this argument for many of the same reasons it

rejected Plaintiffs' similar PWR 107 concerns. *See supra* Part III.A.i. Indeed, Chapter 3 of the

FEIS dedicates at least 145 pages to analyzing mitigation plans for potential impacts to the

ground water sources at issue. (*See* FEIS, AR 049827–049972). This discussion includes

analysis of the site-specific mitigation triggers and plans for the 22 springs and 2 streams within

the drawdown area. (FEIS, Table 3.2-9, AR 049895–049908). Chapter 3 also details the

monitoring plans for each of the affected water sources. (*Id.*). Finally, to the extent that Plaintiffs

assert that the FEIS fails to identify the source of the substitute mitigation water, (*see* Mot.

Summ. J., ECF No. 56, at 36), they are simply mistaken. The FEIS plainly provides that the

substitute water will initially come from EML's existing ground water rights unless additional

ground water rights are secured. (FEIS, AR 049892). Not surprisingly, Plaintiffs do not even

attempt to argue that these sources are inadequate. Therefore, BLM took a "hard look" at

possible mitigation measures, and the Court is without reason to conclude that the water-source

analysis is deficient.

### 4.   The Pit Lake

Plaintiffs' final NEPA argument assumes that because the pit lake water will eventually

exceed state water quality standards for several constituents, BLM must require mitigation. (Mot.

Summ. J., ECF No. 56, at 37). There is significant overlap between this argument and Plaintiffs'

similar FLPMA argument, which is fully analyzed and rejected below, *see infra* Part III.C.

Relying in part on that analysis, the Court here concludes that BLM took a "hard look" and

reasonably declined to require mitigation because: (1) the pit lake water will, at all times, comply

with applicable Nevada law, *id.*; (2) access to the pit lake will be restricted and the water will not

be used for human consumption, irrigation, stock watering, fishing, or recreational purposes,

(FEIS, AR 049999); and (3) the pit lake will sit within a hydrologic sink, meaning that it will not

discharge into surrounding ground water, (*id.* at 079796–049797). Therefore, the Court finds that

BLM's analysis of the Project complies with NEPA's procedural requirements, and Plaintiffs'

motion for summary judgment is denied with respect to the NEPA claim.

### C.   Claim 3: Federal Land Policy Management Act

With their final claim, Plaintiffs merely rebrand their earlier arguments with an FLPMA

heading. Specifically, they contend that BLM violated FLPMA's prohibition against unnecessary

or undue degradation for three reasons: (1) the pit lake water quality is expected to exceed

federal and state standards; (2) the Project will impact PWR 107 waters; and (3) BLM

inadequately studied baseline air quality. (Mot. Summ. J., ECF No. 56, at 37–38 ). The Court disagrees.

"FLPMA creates a duty on the part of agencies like BLM to take action to prevent 'unnecessary and undue degradation of the lands.'" *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 723–24 (9th Cir. 2009) (quoting 43 U.S.C. § 1732(b)). For the purposes of this case, "'unnecessary or undue degradation' is defined as any harmful activity that is either not 'reasonably incident' to an approved mining operation or that violates a state or federal law relating to environmental or cultural resource protection." *Id.* (quoting 43 C.F.R. § 3809.5).

With respect to the pit lake water quality, the FEIS acknowledges that "[o]f the constituents that are regulated by the State of Nevada . . . [six constituents] are expected to be near or above Nevada reference standards and EPA drinking [water quality criteria]" 200 years after mining ceases. (FEIS, AR 049999). The FEIS further states that:

> [i]nitial pit lake water quality is predicted to be good and would meet Nevada enforceable [drinking water standards]. As evaporation from the lake surface concentrates the dissolved minerals, some water quality constituent concentrations would be predicted to increase over time relative to baseline concentrations and to exceed the present Nevada water quality standards (see Table 3.3-1). The pit lake would be a water of the State of Nevada, and applicable water quality standards would depend on the present and potential beneficial uses of the lake. Access to the open pit by humans and livestock would be restricted. The lake is not intended to be a drinking water source for humans or livestock or to be used for recreational purposes. Therefore, standards to protect these beneficial uses would not be directly applicable. Aquatic standards would also not be applicable since EML does not plan to have the pit lake stocked with fish. This approach is consistent with NAC 445A.429. Exposure to terrestrial and avian wildlife species is discussed in Section 3.23.3.

(*Id.*). Plaintiffs assume that because the post-mining pit water "is predicted to violate federal state water quality standards," BLM has approved an undue or unnecessary degradation in violation of FLPMA. (Mot. Summ. J., ECF No. 56, at 37).This argument,

however, takes no account for the applicable law. As an initial matter, Plaintiffs do not, and indeed cannot, contend that the pit lake is not "reasonably incident to an approved mining operation." *S. Fork Band*, 588 F.3d at 723–24. Therefore, their degradation argument necessarily turns on whether the post-mining water quality "violates a state or federal law." *Id.* It does not.

Plaintiffs cite no substantive authority in support of their position, and the Court is not aware of any federal law that prohibits the precise degradation at issue. With respect to state law, the predicted water quality appears fully compliant. Nevada has adopted a comprehensive regulatory scheme governing water quality issues at pit lakes. *See* Nev. Admin. Code § 445a.429. These regulations do not strictly require pit lakes to meet Nevada's water quality standards. Instead, "bodies of water that are a result of mine pits" must not have the "potential to degrade the groundwaters of the State" or "the potential to affect adversely the health of human, terrestrial or avian life." *Id.* § 445a.429(3). Nevada enforces these requirements by requiring mine operators to obtain a Water Pollution Control Permit ("WPCP") from NDEP. *See id.* §§ 445a.390–445a.447.

Here, BLM specifically required EML to obtain a WPCP and comply with applicable state regulations. (ROD, AR 051852). NDEP granted a permit to EML because the pit lake is expected to comply with the applicable state law. (WPCP, AR 052080–052099; *see also* FEIS, AR 049999 (citing Nev. Admin. Code § 445a.429)). Accordingly, the Court lacks any reason to conclude that the predicted pit lake water quality constitutes an "unnecessary and undue degradation of the lands" in violation of FLPMA. Plaintiffs' pit lake argument is therefore unavailing.

Finally, to the extent that Plaintiffs contend that an undue degradation will result

from (1) the Project's impact "on PWR 107 waters"; and (2) BLM's allegedly inadequate baseline air quality analysis, (Mot. Summ. J., ECF No. 56, at 37–38 ), the Court has already concluded that (1) even if the water sources at issue qualify for PWR 107 status, they will be adequately protected, *see supra* Part III.A.i; and (2) Plaintiffs have failed to show an inadequacy in BLM's air quality analysis, *see supra* Part III.B.ii. Therefore, Plaintiffs have failed to demonstrate an FLPMA violation, and the instant motion for summary judgment is denied.

## CONCLUSION

IT IS HEREBY ORDERED that Plaintiffs' motion for summary judgment (ECF No. 56) is DENIED.

IT IS SO ORDERED.

Dated:  July 23, 2014

_____
ROBERT C. JONES
United States District Judge